ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Nov-06  13:08:48
60CV-17-6345
C06D06 : 28 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
_____ DIVISION

PROPST PROPERTIES, LLC                                    PLAINTIFF

v.                              CASE NO. _____

WESTBROOK WILLOW, LLC                              DEFENDANT

## COMPLAINT

Propst Properties, LLC, for its complaint against Westbrook Willow, LLC, states:

### PARTIES, JURISDICTION, AND VENUE

1.      Propst Properties, LLC ("Propst") is a domestic limited liability company licensed to do business in the State of Arkansas, with its principal place of business located in Black Rock, Lawrence County, Arkansas.

2.      Westbrook Willow, LLC ("Westbrook") is a foreign limited liability company licensed to do business in the State of Texas, with its principal place of business located in Houston, Harris County, Texas.

3.      This Court has jurisdiction over the parties to and the subject matter of this litigation pursuant to Arkansas Code Annotated §§ 16-4-101 and 16-58-120.

4.      The parties have agreed that venue is proper in this Court. *See* Consultant Agreement ¶ 9, attached hereto and incorporated herein as Exhibit 1.

---

**EXHIBIT**

**A**

## FACTS

5.      Propst is engaged in the frac-sand and frac-proppant industries.  Specifically, Propst owns real property in Lawrence County, Arkansas.  The real property Propst owns allows for the placement of plants that process and refine sand and limestone, and includes the necessary water, utility, and railway connections that allow for these processing plants to become operational.

6.      Propst leases the real property it owns to sand processors, who use the processing plants to refine the sand or limestone either mined from Propst's properties or shipped to the processing plants located on Propst's properties from other mines.  The refined sand or limestone is then shipped to customers for use in the hydraulic fracturing, or "fracking," industry.

7.      In the summer of 2014, Propst entered into a lease agreement with American Silica, LLC ("American Silica"), a sand processor.

8.      Pursuant to that lease, Propst leased real property in Lawrence County to American Silica to build a processing plant.

9.      After entering into its lease with American Silica, Propst recognized a business opportunity to lease its remaining property in Lawrence County to other sand processors because it has the necessary lot space and the necessary water, utility, and railway connections to make additional processing plants operational and economically viable.

10.      Propst estimated that its remaining property could hold at least two more processing plants.

11.      Propst, however, lacked the necessary market expertise and connections within the marketplace to market and lease its properties on its own.

12.    Accordingly, Propst contacted ZIGURDS VITOLS with the intention of entering into a consulting agreement with his company, WESTBROOK, so he could bring Propst lessors like American Silica.

13.    Mr. Vitols was uniquely qualified for this consulting relationship and was sought after by Propst because he previously worked for another sand processor and claimed to have extensive contacts in the sand-processing industry.

14.    On August 7, 2014, Propst entered into a Consultant Agreement (the "Agreement") with Westbrook. *See* Ex. 1.

15.    Pursuant to the Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

16.    Pursuant to the Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

17.    Pursuant to the Agreement, Propst retained Westbrook "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst] (the "Consulting Services")." Ex. 1 ¶ 1.

18.    Pursuant to the Agreement, and "[i]n consideration for providing the Consulting Services," Propst agreed to pay Westbrook an hourly rate for its services on a monthly basis, but in any event the monthly payments to Westbrook would not be less than two thousand dollars. Ex. 1 ¶ 2(a).

3

19.     Pursuant to the Agreement, and "[i]n consideration for providing the Consulting Services," Propst agreed to pay Westbrook "a ten percent (10%) commission on all gross revenues and income received by [Propst] related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future [if Propst] receive[d] monthly gross income in excess of twenty thousand dollars ($20,000)." Ex. 1 ¶ 2(a), (b).

20.     Shortly after the Agreement was signed, Propst specifically asked Mr. Vitols to try and obtain business from La Ronge Gold Corporation.

21.     La Ronge Gold Corporation subsequently changed its name to Select Sands Corporation in November 2014. For the purposes of this Complaint, La Ronge Gold Corporation and Select Sands Corporation are collectively referred to as "Select Sands."

22.     Propst also specifically asked Mr. Vitols to try and obtain business from Lehigh Hanson ("Hanson") and Cemex.

23.     Despite these express instructions and the Agreement's express provision that Westbrook "advise, negotiate, and provide other services related to the frac proppant business . . . as reasonably requested by [Propst,]" Westbrook primarily sought to obtain business only from Select Sands.

24.     Upon information and belief, Mr. Vitols had a prior relationship with RASOOL MOHAMMAD, who in 2014 was Select Sands' President and Chief Executive Officer.

25.     While President and Chief Executive Officer, and before Westbrook entered into the Agreement, Propst contacted Mr. Mohammad to solicit him to lease the real property eventually leased to American Silica.

4

26.     Mr. Mohammad declined to lease this property from Propst at that time, but later and after the Agreement was executed, Mr. Mohammad notified Propst, through Mr. Vitols, that Select Sands was interested in leasing the remaining property from Propst.

27.     Mr. Vitols then spent several months encouraging Propst to pursue a lease agreement only with Select Sands.

28.     Mr. Vitols only offered token assistance in helping Propst obtain leases from Hanson and Cemex.

29.     And Mr. Vitols offered no assistance in helping Propst obtain leases from any other sand processors.

30.     On or around December 14, 2014, Mr. Vitols was appointed to Select Sands' board of directors.

31.     Mr. Vitols assured Propst that his directorship would not interfere or in any way prohibit Westbrook from performing the Agreement's terms.

32.     After Mr. Vitols's appointment to Select Sands' board of directors, however, efforts to obtain business from Select Sands ground to a halt, and no further efforts to obtain business from Hanson, Cemex, or any other sand processors took place.

33.     On or around July 21, 2015, Mr. Vitols was appointed as Select Sands' new Chief Operating Officer. *See* Press Release, attached hereto and incorporated herein as Exhibit 2.

34.     Neither Westbrook nor Mr. Vitols notified Propst that Mr. Vitols accepted a position as Select Sands' Chief Operating Officer.

35.     On or around October 5, 2016, Select Sands entered into a binding agreement with Tutle Holding, LLC and Steve Hackman, Ozark Premium Sand LLC (collectively, "Ozark Premium Sand"). *See* "Select Sands Agrees to Deal with Ozark Premium Sand," *RockProducts* (Oct. 5, 2016), attached hereto and incorporated herein as Exhibit 3.

36.     Pursuant to that agreement, Select Sands' wholly owned subsidiary, American Select Corporation ("American Select"), holds the option to purchase "a 26-acre fully operational drying facility with storage located within 50 miles of Select Sands' quarry in Arkansas.  The 26-acre facility is located on the Union Pacific Rail Line." *Id.*

37.     If American Select exercises the option, Select Sands would be "transform[ed] . . . into a fully integrated, self-sufficient Tier 1 sand producer with capacity to process more than 600,000 [tons per year] with an excellent logistics and storage advantage[.]" *Id.*

38.     "In addition, the facility [could] be easily expanded to increase the amount of sand that can be processed." *Id.*

39.     Mr. Mohammad praised the agreement upon its announcement, stating, "'[Select Sands'] timing to become a new supplier of high-purity, finer mesh sand couldn't come at a better time for our shareholders.'" *Id.*

40.     Upon the agreement's announcement, Select Sands became Propst's direct competitor.

41.     Select Sands became Propst's direct competitor because it now possesses an option through American Select, a wholly owned subsidiary, to purchase a fully operational processing facility within close proximity to sand and limestone mines and with the necessary water, utility, and railway access to allow the facility to remain operational and economically viable.

42. Select Sands would therefore have an interest in leasing the facility to sand processors and would compete with Propst for these potential lessees.

43. Any lessee brought by Westbrook to Propst would also be Select Sands' direct competitor.

44. Because American Select, Select Sands' wholly owned subsidiary, possesses an option to purchase a fully operational processing facility, Select Sands has an interest in ensuring that only American Silica leases real property from Propst and the number of sand processors located in northeast Arkansas remains at current levels.

45. On or around December 23, 2016, Mr. Vitols was appointed to be Select Sands' new President and Chief Executive Officer. *See* Press Release, attached hereto and incorporated herein as Exhibit 4.

46. Neither Mr. Vitols nor Westbrook notified Propst that Mr. Vitols accepted a position as Select Sands' President and Chief Executive Officer.

47. The same day, Mr. Mohammad was announced as Select Sands' Chief Operating Officer and American Select's new President. *See id.*

48. Mr. Vitols's acceptance of positions as Select Sands' Chief Operating Officer and, later, as its President and Chief Executive Officer while Westbrook's Agreement with Propst remained in full force and effect created a blatant conflict of interest.

49. Because Mr. Vitols is now Select Sands' President and Chief Executive Officer, and Select Sands is now Propst's direct competitor, Westbrook cannot possibly perform its Agreement with Propst.

50. Westbrook cannot direct business from Select Sands to Propst because that would violate Mr. Vitols's fiduciary duties to Select Sands.

7

51.     Westbrook cannot direct business from Hanson or Cemex to Propst because that would violate Mr. Vitols's fiduciary duties to Select Sands.

52.     And Westbrook cannot direct or solicit business from any other sand processors on Propst's behalf because that would violate Mr. Vitols's fiduciary duties to Select Sands.

53.     It was incumbent on Westbrook to inform Propst of these conflicts of interest and that it would not be able to perform the Agreement's basic objectives due to these conflicts of interest, but Westbrook failed to do so.

54.     As of the date of this filing, Propst has paid Westbrook $91,000 pursuant to the Agreement.

55.     Westbrook accepted these money payments without objection or hesitation. Westbrook, moreover, failed to take the opportunity upon receipt of money payments in 2015 and 2016 to disclose Mr. Vitols's new employment with Select Sands or the fact that Select Sands was now Propst's direct competitor. Instead, in a 2016 telephone conversation with Paul Propst, Mr. Vitols said, "I don't feel like I've done anything to deserve this." Notwithstanding, Westbrook neither returned any portion of the money payments it received nor offered to do so.

56.     Propst's money payments do not include continuing amounts that will become due and payable pursuant to the Agreement. *See* Ex. 1.

57.     As of the date of this filing, Westbrook has not returned any of the money payments it received.

58.     And as of the date of this filing, Westbrook has not provided Propst with any viable business opportunities from Select Sands, Hanson, Cemex, or any other sand processors.

## COUNT I – BREACH OF FIDUCIARY DUTY

59.     Propst incorporates paragraphs 1 through 58 by reference.

60.     At all relevant times and for the reasons set forth above, Westbrook, through Mr. Vitols, acted as Propst's agent.

61.     Pursuant to that agency relationship, Westbrook owed certain fiduciary duties to Propst, including but not limited to fiduciary duties of utmost good faith and loyalty, to avoid acting adversely to Propst's interests, to not acquire a private interest in opposition to Propst, and to avoid self-dealing and conflicts of interest. *See Cole v. Laws*, 349 Ark. 177, 76 S.W.3d 878 (2002); *Collins v. Heitman*, 225 Ark. 666, 284 S.W.2d 628 (1955); *Yahrus v. Continental Oil Co.*, 218 Ark. 872, 239 S.W.2d 594 (1951).

62.     Westbrook, through Mr. Vitols, breached its fiduciary duties to Propst.

63.     Westbrook exhibited neither good faith nor loyalty to Propst and acted adversely to Propst's interests by allowing Mr. Vitols to accept positions of employment as Select Sands' Chief Operating Officer and, later, its President and Chief Executive Officer.

64.     Westbrook allowed Mr. Vitols to accept these positions of employment even though it knew Propst instructed Westbrook to attempt to obtain business from Select Sands, and even though it knew that it would be impossible to obtain business from Select Sands without violating Mr. Vitols's fiduciary duties to Select Sands.

65.     Westbrook also allowed Mr. Vitols to accept these positions of employment even though it knew Propst instructed Westbrook to attempt to obtain business from Hanson, Cemex, and other sand processors, and even though it knew that it would be impossible to obtain business from Hanson, Cemex, or other sand processors without violating Mr. Vitols's fiduciary duties to Select Sands.

9

66.     Westbrook, through Mr. Vitols, acquired a private interest in opposition to Propst and engaged in self-dealing by allowing Mr. Vitols to accept positions of employment with Select Sands that created a conflict of interest, and by accepting money payments from Propst without objection or hesitation and without notifying Propst of these conflicts of interest.

67.     Westbrook, through Mr. Vitols, breached its fiduciary duties to Propst by encouraging Propst to pursue a lease agreement only with Select Sands.

68.     Westbrook, through Mr. Vitols, breached its fiduciary duties to Propst by only offering token assistance in helping Propst obtain leases from Hanson and Cemex.

69.     And Westbrook, through Mr. Vitols, breached its fiduciary duties to Propst because it failed to offer any assistance in helping Propst obtain business from any other sand processors.

70.     Due to Westbrook's breaches of its fiduciary duties to Propst, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

## COUNT II – BREACH OF CONTRACT

71.     Propst incorporates paragraphs 1 through 70 by reference.

72.     Pursuant to the Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

73.     Pursuant to the Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

74.     Pursuant to the Agreement, Westbrook agreed "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst] (the "Consulting Services")." Ex. 1 ¶ 1.

75.    And pursuant to the Agreement, Propst agreed to make money payments to Westbrook "[i]n consideration for providing the Consulting Services[.]" Ex. 1 ¶ 2(a), (b).

76.    Additionally, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *West Memphis Adolescent Residential, LLC v. Compton*, 2010 Ark. App. 450, 5, 374 S.W.3d 922, 925. "Moreover, a party has an implied obligation not to do anything that would prevent, hinder, or delay performance." *Id.* at 5–6, 374 S.W.3d at 925.

77.    Propst performed its express obligations under the Agreement, and has not waived its right to insist upon full and complete performance of the Agreement.

78.    Propst performed its implied obligations under the Agreement, and has not engaged in any activity that prevented, hindered, or delayed either its or Westbrook's performance of the Agreement.

79.    Westbrook, through Mr. Vitols, breached the Agreement's express and implied terms by allowing Mr. Vitols to accept positions of employment with Select Sands as its Chief Operating Officer and, later, its President and Chief Executive Officer.

80.    Mr. Vitols's acceptance of these positions of employment makes it impossible for Westbrook to perform the Agreement.

81.    Mr. Vitols cannot direct any business from Select Sands to Propst without violating his fiduciary duties to Select Sands, even though Propst and the Agreement specifically directed Westbrook to attempt to obtain business from Select Sands.

82.    Mr. Vitols cannot direct any business from Hanson or Cemex to Propst without violating his fiduciary duties to Select Sands, even though Propst and the Agreement specifically directed Westbrook to attempt to obtain business from Hanson or Cemex.

11

83. And Mr. Vitols cannot direct any business from any other sand processors to Propst without violating his fiduciary duties to Select Sands, even though Propst and the Agreement specifically directed Westbrook to attempt to obtain business from other sand processors.

84. Notwithstanding Westbrook's knowledge that Mr. Vitols's acceptance of these positions of employment created a blatant conflict of interest and made its performance of the Agreement impossible, Westbrook continued to accept money payments from Propst without objection or hesitation, and without notifying Propst of these conflicts of interest or the fact that the Agreement had become impossible to perform. Westbrook therefore violated the Agreement's implied terms "of good faith and fair dealing in its performance and its enforcement." *West Memphis Adolescent Residential, LLC*, 2010 Ark. App. 450, at 5, 374 S.W.3d at 925.

85. Moreover, Westbrook, through Mr. Vitols, breached the Agreement's express and implied terms by only offering token assistance in helping Propst obtain business form Hanson and Cemex.

86. Westbrook, through Mr. Vitols, breached the Agreement's express and implied terms by failing to offer any assistance in helping Propst obtain business from other sand processors.

87. Due to Westbrook's breaches of the Agreement, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

88. Propst is entitled to pre-judgment and post-judgment interest in the greatest amount allowed by law.

89. Propst is entitled to its attorneys' fees and costs pursuant to Arkansas Code Annotated § 16-22-308 and Arkansas Rule of Civil Procedure 54.

12

## COUNT III – DECLARATORY JUDGMENT

90.     Propst incorporates paragraphs 1 through 89 by reference.

91.     Under Arkansas law, "when performance of a duty under a contract is contemplated, any nonperformance is a breach [and] the failure of one party to perform his contractual obligations releases the other party from his obligations." *Arkansas Realtors Ass'n v. Real Forms, LLC,* 2014 Ark. 385, 10, 445 S.W.3d 845, 852.

92.     Additionally, "the essential elements of a contract are (1) competent parties, (2) subject matter, (3) *legal consideration,* (4) mutual agreement, and (5) mutual obligation." *Bank of the Ozarks, Inc. v. Walker,* 2016 Ark. 116, 2, 487 S.W.3d 808, 810 (emphasis added).

93.     "[F]ailure of consideration, total or partial, occurs when the consideration good and sufficient at the time the agreement is made, by some breach of contract, mistake or accident, has afterwards failed." *Ozark Diamond Mines Corp. v. Townes,* 117 Ark. 552, 174 S.W. 151, 153 (1915).

94.     When a contract's consideration fails, the contract is broken. *See Puckett v. United States,* 556 U.S. 129, 137 (2009) (citing 23 R. Lord, Williston on Contracts § 63.1 (4th ed. 2002)). Accordingly, "[t]he party injured by the breach will generally be entitled to some remedy, which might include the right to rescind the contract entirely[.]" *Id.* (citing 23 R. Lord, Williston on Contracts § 68.1 (4th ed. 2003)).

95.     Pursuant to the Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

96.     Pursuant to the Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

97.     Pursuant to the Agreement, Westbrook agreed "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst] (the "Consulting Services")." Ex. 1 ¶ 1.

98.     And pursuant to the Agreement, Propst agreed to make money payments to Westbrook "[i]n consideration for providing the Consulting Services[.]" Ex. 1 ¶ 2(a), (b).

99.     For the reasons set forth above in Count II, the Agreement is now impossible to perform because Mr. Vitols cannot direct business from Select Sands, Hanson, Cemex, or any other sand processor to Propst without violating his fiduciary duties to Select Sands.

100.    Because the Agreement specifically contemplates Westbrook's provision of "Consulting Services" as its consideration, and Westbrook cannot now perform the "Consulting Services" due to Mr. Vitols's conflicts of interest, the Agreement's consideration has failed, and Propst is entitled to a declaratory judgment that the Agreement is rescinded.

101.    Additionally and for the reasons set forth above in Count II, Westbrook breached the express terms of the Agreement by failing "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst]." Ex. 1 ¶ 1.

102.    Also for the reasons set forth in Count II, Westbrook breached the Agreement's implied terms of good faith and fair dealing, and the Agreement's implied terms to not do anything that would prevent, hinder, or delay either its or Propst's performance of the Agreement. *See West Memphis Adolescent Residential, LLC*, 2010 Ark. App. 450, at 5, 374 S.W.3d at 925.

103.   Westbrook's breaches of the Agreement were material, because performing the Agreement's basic objectives as specifically directed by Propst and the Agreement and preventing against blatant conflicts of interest that would make Westbrook's performance of the Agreement impossible were "essential term[s] or condition[s] that substantially defeat[ed] the purpose of the [Agreement] for [Propst]." *Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, 21, 389 S.W.3d 77, 93.

104.   Accordingly and due to these material breaches of the Agreement, Arkansas law demands that this Court declare the Agreement to be at its end. *See Arkansas Realtors Asss'n*, 2014 Ark. 385, at 10, 442 S.W.3d at 852.

105.   Propst is therefore entitled to a declaratory judgment that Westbrook's breaches of the Agreement, as more fully described in Count II, were material.

106.   Propst is also therefore entitled to a declaratory judgment that the Agreement is now null and void and no longer in full force and effect due to Westbrook's material breaches of the Agreement.

### COUNT IV – PROMISSORY ESTOPPEL

107.   Propst incorporates paragraphs 1 through 106 by reference.

108.   In return for money payments from Propst, Westbrook promised "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by Propst." Ex. 1 ¶ 1.

109.   In return for money payments from Propst, Westbrook promised to make reasonable efforts to obtain and secure business from Select Sands, Hanson, Cemex, and other sand processors, as reasonably requested by Propst.

110.   Propst, relying on Westbrook's promises, made money payments to Westbrook.

111.    Westbrook refused to honor its promises to Propst to make reasonable efforts to obtain and secure business for Propst from Select Sands, Hanson, Cemex, and other sand processors, as specifically requested by Propst.

112.    Westbrook has also refused to honor its promises to Propst by allowing Mr. Vitols to accept positions of employment with Select Sands, creating a blatant conflict of interest that makes Westbrook's performance of the Agreement impossible.

113.    It is unjust for Westbrook, through Mr. Vitols, to fail to honor its promises to Propst.

114.    It is unjust for Propst to have made money payments to Westbrook when Westbrook, through Mr. Vitols, failed to honor its promises to Propst.

115.    It is unjust for Westbrook, through Mr. Vitols, to have accepted these money payments without objection or hesitation, with full knowledge that it failed to honor its promises to Propst, and that it has allowed a blatant conflict of interest to arise that makes its performance of the Agreement impossible.

116.    It is unjust for Westbrook, through Mr. Vitols, to have accepted these money payments without informing Propst that Mr. Vitols accepted positions of employment with Select Sands that created a blatant conflict of interest that makes its performance of the Agreement impossible.

117.    As a result of Westbrook's failure to honor its promises to Propst, through Mr. Vitols, Propst has suffered damages in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases, and including but not limited to its money payments to Westbrook and its attorneys' fees and costs incurred in this action.

WHEREFORE, Propst Properties, LLC, prays:

(a)     For judgment in Propst Properties, LLC's favor and against Westbrook Willow, LLC;

(b)     For damages in excess of $75,000.00, exclusive of interest and costs;

(c)     For a declaratory judgment that Propst Properties, LLC's Agreement with Westbrook Willow, LLC is null and void, and no longer in full force and effect;

(d)     For Propst Properties, LLC's attorneys' fees and costs;

(e)     For pre-judgment and post-judgment interest in the greatest amount allowed by law; and

(f)     For all other relief to which Propst Properties, LLC is entitled.

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
mshannon@qgtlaw.com
jprice@qgtlaw.com
twyatt@qgtlaw.com


By:/s/ Michael N. Shannon
    Michael N. Shannon, Ark. Bar No. 92168
    Joseph W. Price, II, Ark. Bar No. 2007168
    Thomas H. Wyatt, Ark. Bar No. 2013273

*Attorneys for Propst Properties, LLC*

COPY

## CONSULTANT AGREEMENT

THIS CONSULTANT AGREEMENT (the "**Agreement**") is effective this _7th_ day of _AUGUST_____, 2014 (the "**Effective Date**"), by and between, Propst Properties, LLC, an Arkansas limited liability company ("**Company**"), its successors and assigns and affiliates, subsidiaries and related entities, whose address is _P.O. BOX 85 BLACK ROCK AR 72415_ and Westbrook Willow, LLC, an Arkansas limited liability company, its successors and assigns and affiliates, subsidiaries and related entities ("**Consultant**"), whose address is _349 PARADISE R. Hot Springs AR_ Company and Consultant are sometimes referred to individually as a "**Party**" and sometimes collectively as the "**Parties.**"

WHEREAS, Company is engaged in the frac sand industry and hosts processors of frac sand and provides land for reserves of frac sand and/or processing of frac sand.

WHEREAS, Consultant provides consulting, advising, negotiation, and other services to frac proppant businesses.

WHEREAS, Company desires to engage Consultant and Consultant desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to the Company.

NOW THEREFORE, for and in consideration of the mutual terms and conditions set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, the Parties agree as follows:

1. <u>Services.</u>   The Company hereby retains Consultant to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by Company (the "Consulting Services").

2. <u>Compensation.</u>

(a) In consideration for providing the Consulting Services,  the Company agrees to pay Consultant, on a monthly basis, a sum equal to $150 per hour spent by Consultant in performing the Consulting Services; it being understood by the Parties that at all times during the Agreement, the monthly sum paid to Consultant shall be no less than two thousand dollars ($2,000).

(b) Upon the occurrence of the Company receiving monthly gross income in excess of twenty thousand dollars ($20,000), the Parties agree that Consultant shall be paid a ten percent (10%) commission on all gross revenues and income received by Company related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future. Upon the occurrence of the events listed in this Section, the payment of sums listed in Section 2(a) shall cease.  Notwithstanding the foregoing, the Parties agree that if in any given month the commission amounts listed in this Section shall be less than $2,000, then the sums for Consulting Services listed in Section 2(a) shall be reinstituted such that Consultant shall at no time receive less than $2,000 a month from Company.  The terms in this Section 2(b) shall survive the termination of this Agreement and shall continue to be binding on the Parties and their respective successors, assigns, and principals for at least ten (10) years from the onset of the particular revenue stream to Company related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future.  For example, if Company enters into a contract whereby it receives revenue related to its frac proppant business in Lawrence County, Arkansas, in year 2 of this Agreement (2015), Consultant shall continue to receive its 10% commission on gross revenues received from such contract until the end of year 12 of this Agreement or until at least 2024 if the Agreement is terminated early, as provided herein.

**EXHIBIT**

_1_

3.  Term.  This Agreement shall begin as of the Effective Date hereof and shall continue for a period of twenty (20) years hereafter.  Consultant may terminate this agreement without cause or penalty at any time upon the delivery of 30 days' prior written notice to the Company.  At the conclusion of the twenty (20) year initial term, this agreement shall automatically renew for successive one-year terms unless terminated as provided herein.  Notwithstanding the foregoing, all compensation due under Section 2(b) shall survive the termination of this Agreement and shall continue to be binding on the Parties and their respective successors, assigns, and principals for at least ten (10) years from the onset of the particular revenue stream to Company related to its frac proppant business in Lawrence County, Arkansas (as more particularly described in Section 2(b)).

4.  Expenses.  In addition to the payment of the compensation as identified herein, the Company agrees to reimburse Consultant for all reasonable and necessary expenses that Consultant may incur from time to time within ten (10) days of invoice.  ~~Should Consultant anticipate incurring expenses in excess of $5,000 during any single calendar month, then~~ Consultant shall receive prior approval from the Company as a condition to reimbursement hereunder.

5.  Cooperation and Disclosure of Financials and Contracts.  Company agrees to use its commercially reasonable efforts to cooperate with and support Consultant in the performance of Consultant's duties as contemplated under this Agreement.  Further, Company agrees to provide monthly income statements of the Company, any financial records of the Company, and copies of any contracts or agreements that outline revenue streams to the Company, to Consultant, upon request.

6.  Independent Contractor Status.  It is acknowledged, agreed and understood that Consultant shall serve as an independent contractor to the Company and not as an employee of the Company.  Further, it is agreed and understood by the Parties that Consultant shall be entitled to render similar services for other companies and organizations.

7.  Representations and Warranties.

The Parties each covenant and agree to the following:

(a)  The Party is a corporation, duly organized, validly existing and in good standing under the laws of the State of Arkansas and is duly qualified and in good standing in each jurisdiction in which the failure to so qualify would materially and adversely affect its ability to perform its obligations under this Agreement.

(b)  The Party has the full corporate power and authority to execute, deliver and perform this Agreement and such execution, delivery and performance has been duly authorized by all necessary corporate action on the part of the Party.

(c)  Neither the execution nor delivery by the Party of this Agreement or of any of the other agreements contemplated to be executed by the Party pursuant to this Agreement will conflict with or result in a violation of the corporate documents of the Party or of any other written or oral agreement, arrangement or understanding to which the Party is a party or by which any of its assets, properties or rights are or may be affected.

(d)  There are no actions, proceedings, claims or judgments pending, or to the Party's knowledge, threatened, against the Party that might have a material adverse effect on this Agreement, its financial condition or its ability to perform its obligations under this Agreement or any of the agreements contemplated to be executed by the Party pursuant to this Agreement.

8.  Indemnification.  The parties hereto agree to indemnify and hold harmless one another, and their respective officers, directors, equity holders, agents and employees from and against all liabilities and causes of action of every nature except for those liabilities and causes of action that might arise as the result of the gross negligence and/or willful misconduct of the other.  If a claim by a third party is made against Consultant or the Company Parties (the "**Indemnified Party**"), and if the Indemnified Party intends to seek indemnity with respect to such claim, the Indemnified Party shall give written notice to the other Party of such claim promptly after the Indemnified Party becomes aware of such claim.  Such notice shall set forth such information with respect to such claim as is then reasonably available to the Indemnified Party.

9.  Miscellaneous.  This agreement constitutes the entire understanding of the Parties hereto and may not be verbally modified.  This agreement may only be modified and amended pursuant to a written document that is executed by the parties hereto.  The laws of the state of Arkansas shall govern this Agreement and all litigation arising hereunder shall occur exclusively in Pulaski County, Arkansas.  All provisions contained in this Agreement shall be binding on, inure to the benefit of, and be enforceable by Company and Consultant, and the permitted successors and assigns of Company and Consultant to the same extent as if each such successor and assign were named as a party to this Agreement. If any term, covenant, condition, or provision of this Agreement, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, it shall be adjusted rather than voided, if possible, to achieve the intent of the Parties.  Any invalidity resulting from the length of a period of time shall be considered reduced to a period of time, which would cure such invalidity.  If adjustment is not possible, then in each such event the remainder of this Agreement or the application of such term, covenant, condition or provision to any person or any other circumstance (other than those as to which has been held invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by applicable law.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date above written.

COMPANY:

Propst Properties, LLC

By: _____ JAMES F. PROPST

Title: MEMBER _____

CONSULTANT:

Westbrook Willow, LLC

By: _____

Title: PRESIDENT _____

Select Sands Appoints Zig Vitols as Chief Operations Officer - Select Sands Corp

✉ SUBSCRIBE    📞 +1 604-639-4533

## Select Sands Appoints Zig Vitols as Chief Operations Officer

**EXHIBIT**

tabbies

**2**

Select Sands Appoints Zig Vitols as Chief Operations Officer (http://www.selectsandscorp.com/2015/07/21/select-sands-appoints-zig-vitols-as-chief-operations-officer/)

July 21, 2015 – Vancouver, BC, Canada. **– Select Sands Corp (TSXV: SNS, OTC: CLICF)**(the "Company") is pleased to announce the appointment of Zig Vitols as Chief Operations Officer (C.O.O.) of the Company.

Mr. Vitols, a resident in Houston, Texas, has served as the President, Mid-South Division, of Martin Marietta Material, Inc. Martin Marietta, a U.S.-based company included in the S&P 500 Index, is a leading supplier of aggregates and heavy building materials, with operations spanning 32 states, Canada, and the Caribbean. Mr. Vitols worked as the Northeast Regional Manager for W. R. GRACE & Co, a publicly traded company which produces specialty chemicals and materials and operates in over 40 countries. Mr. Vitols has a Masters of International Business (MBA) from Heriot Watt University, Edinburgh, Scotland.

As C.O.O., Mr. Vitols will be responsible for planning the Company's rail and transportation distribution network, managing its logistics and distribution functions, optimizing operational costs, providing a major role in business development including the negotiations of contracts, and generally assisting the Company to obtain and increase market share and help advance the Company's industrial sand project in Arkansas. Mr. Vitols will remain a member of the Select Sands' Board of Directors.

#### About Select Sands Corp.

**Select Sands** Sandtown property, located in Northeast Arkansas, USA, is underlain by the Ordovician St. Peter sandstone formation, *the* source of 'Ottawa White' Tier-1 frac sand/industrial sand selling into major US oil and gas basins as well as industrial and speciality end markets. The Sandtown property is located 3.1 miles from Highway 167, near a natural gas pipeline, has an active power line on the property, and is about 14.7 miles away from the nearest rail system (See December 4, 2014 News Release). Sandtown has a competitive location advantage of 650 rail miles closer to Texas/Louisiana oil/gas plays and Houston port and industrial hub over Wisconsin sand mines.

As per Tetra Tech of Golden Colorado and Vancouver, BC, Canada recently completed report, **40%** of the Sandtown property contains **22 million tons** of Indicated resources of silica sand with a **pre-tax NPV valued at US $160 million** (See June 10,2015 News Release).

The Company also owns high-grade gold deposits in the La Ronge Gold Belt, northern Saskatchewan.

Cameron Bartsch, M.Sc., P.Geo., of Tetra Tech, a Qualified Person as defined by National Instrument 43-101, has reviewed the scientific and technical information disclosed in this News Release.

For more information about Select Sands Corp., please visit www.selectsandscorp.com (http://www.selectsandscorp.com) or contact

Rasool Mohammad, B.Sc. (Mining), President & CEO.

Phone 604-639-4533

*Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accepts responsibility for the adequacy or accuracy of this Release.*

FORWARD-LOOKING INFORMATION

*This News Release includes forward-looking information and statements, which may include, but are not limited to, information and statements regarding or inferring the future business, operations, financial performance, prospects, and other plans, intentions, expectations, estimates, and beliefs of the Company. Information and statements which are not purely historical fact are forward-looking statements. Forward-looking information and statements involve and are subject to assumptions and known and unknown risks, uncertainties, and other factors which may cause actual events, results, performance, or achievements of the Company to be materially different from future events, results, performance, and achievements expressed or implied by forward-looking information and statements herein. Although the Company believes that any forward-looking information and statements herein are reasonable, in light of the use of assumptions and the significant risks and uncertainties inherent in such information and statements, there can be no assurance that any such forward-looking information and statements will prove to*

8/23/2017

Select Sands Appoints Zig Vitols as Chief Operations Officer - Select Sands Corp

be accurate, and accordingly readers are advised to rely on their own evaluation of such risks and uncertainties and should not place undue reliance upon such forward-looking information and statements. Any forward-looking information and statements herein are made as of the date hereof, and except as required by applicable laws, the Company assumes no obligation and disclaims any intention to update or revise any forward-looking information and statements herein or to update the reasons that actual events or results could or do differ from those projected in any forward looking information and statements herein, whether as a result of new information, future events or results, or otherwise, except as required by applicable laws.

Facebook (http://www.facebook.com/sharer/sharer.php?u=http://www.selectsandscorp.com/2015/07/21/select-sands-appoints-zig-vitols-as-chief-operations-officer/&t=Select+Sands+Appoints+Zig+Vitols+as+Chief+Operations+Officer)

Twitter

Google+ (https://plus.google.com/share?url=http://www.selectsandscorp.com/2015/07/21/select-sands-appoints-zig-vitols-as-chief-operations-officer/)

LinkedIn (http://www.linkedin.com/shareArticle?mini=true&ro=true&trk=EasySocialShareButtons&title=Select+Sands+Appoints+Zig+Vitols+as+Chief+Operations+Officer&url=http://www.selectsandscorp.com/2015/07/21/sel sands-appoints-zig-vitols-as-chief-operations-officer/)

E-mail (mailto:?subject=Visit this site http://www.selectsandscorp.com&body=Hi, this may be interesting you. 'Select Sands Appoints Zig Vitols as Chief Operations Officer'! This is the link: http://www.selectsandscorp.com/2015/07/21/select-sands-appoints-zig-vitols-as-chief-operations-officer/)

News – 2017 (http://www.selectsandscorp.com/news/2017-releases/)

News – 2016 (http://www.selectsandscorp.com/news/2016-releases/)

News – 2015 (http://www.selectsandscorp.com/news/2015-releases/)

News – 2014 (http://www.selectsandscorp.com/news/2014-releases/)

News – 2013 (http://www.selectsandscorp.com/news/2013-releases/)

News – 2012 (http://www.selectsandscorp.com/news/2012-releases/)

News – 2011 (http://www.selectsandscorp.com/news/2011-releases/)

News – 2010 (http://www.selectsandscorp.com/news/2010-releases/)

In the Media (http://www.selectsandscorp.com/news/media/)

## Latest News

Select Sands Reports Second Quarter 2017 Results (http://www.selectsandscorp.com/2017/08/15/select-sands-reports-second-quarter-2017-results/) August 15, 2017

Select Sands Corporation Schedules Second Quarter 2017 Results Conference Call (http://www.selectsandscorp.com/2017/08/11/sns-schedules-second-quarter-2017-results-coference-call/) August 11, 2017

Select Sands Provides Operations Update (http://www.selectsandscorp.com/2017/06/27/select-sands-provides-operations-update/) June 27, 2017

## Contact us

Select Sands Corp.
Suite 310, 850 W Hastings
Vancouver, BC.

Canada V6C 1E1

Phone: +1 604-639-4533
Fax: +1-604-669-2744
Email: info@selectsandscorp.com

American Select Corp is a US subsidiary of Select Sands Corp

Disclaimer (/disclaimer/)

## Search

Search       🔍

## Subscribe

✉ CLICK HERE TO JOIN

2016 - Select Sands Corp

Select Sands Agrees to Deal with Ozark Premium Sand

Search...

# ROCK
## PRODUCTS

HOME   NEWS   KEY ISSUES   FEATURES   EQUIPMENT & TECHNOLOGY   BLOG   FRAC SAND   BUYERS' GUIDE

Frac Sand ▼

Frac Sand Newsletter     Market Buzz     Producer News     Analysis     New Products     Frac Sar

⁹  **Home**    **Frac Sand**    Select Sands Agrees to Deal with Ozark Premium Sand

## Select Sands Agrees to Deal with Ozark Premium Sand

Published: Wednesday, 05 October 2016 15:20

?

Select Sands Corp. announced that it has entered into a binding agreement with Tutle Holding, LLC and Steve Hackmann, Ozark Premium Sand LLC (OPS) pursuant to which Select Sands' wholly owned subsidiary, American Select Corp., will purchase certain OPS equipment and shall have the option to purchase OPS' dry processing plant, operating equipment, saleable inventory and customer lists amongst other miscellaneous assets owned by OPS.

Included in the assets, in respect to which the company will have an option to purchase, is a 26-acre fully operational drying facility with storage located within 50 miles of Select Sands' Sandtown quarry in Arkansas. The 26-acre facility is located on the Union Pacific Rail Line. If the option is exercised, this transaction will transform Select Sands into a fully integrated, self-sufficient Tier 1 sand producer with capacity to process more than 600,000 tpy with an excellent logistics and storage advantage, the company said. In addition, the facility can be easily expanded to increase the amount of sand that can be processed.

Rascol Mohammad, president and CEO of Select Sands, said, "We are very pleased to come to terms on this transaction that is very favorable for both parties moving forward. In the energy market, Tier-1 regional (40/70 and 100 mesh) sand is in high demand right now, and the market is tightening for this finer sand. Our timing to become a new supplier of high-purity, finer mesh sand couldn't come at a better time for our shareholders."

Pursuant to the terms of the agreement, Select Sands will pay $500,000 upon signing of the agreement to the vendors in respect of the purchase of certain heavy equipment. Select Sands will take title to these assets upon payment of the $500,000.

Select Sands will then have 60 days to complete its due diligence on the remaining assets that are subject to the agreement. If Select Sands is satisfied with its due diligence, then before the end of the due diligence period, it must pay an additional $250,000 to the vendors for certain specified additional heavy equipment and $250,000 as a payment for the option to acquire the remaining assets within the period expiring on the one-year anniversary of the date of payment of the above referenced $250,000 option payment. The purchase price for the remaining assets subject to the option will be $3,317,000, after deducting the $250,000 option payment.

As per the June 2015 PEA report by Tetra Tech of Golden, Colo., and Vancouver, B.C., Canada, the Sandtown property has a pre-tax net present value of $160 million and a post-tax net present value of $92 million.

"This transaction demonstrates our commitment to become a fully integrated producer in the most accretive way possible and demonstrates our aligned interests with shareholders," Mohammad said.

Tags:    [ Select Sands ]    [ 🏷 Select Sands ]    [ 🏷 Tera Tech ]    [ 🏷 Ozark Premium Sand ]    [ 🏷 frac sand ]    [ 🏷 acquisition ]

## Related Articles

- **Polaris Poised to Meet Increased Demand ...**

- **What's the Deal? ...**

- **Twin Eagle Sand Logistics Acquires Terminal...**

- **U.S. Silica to Build Second Frac Sand Plant in the Permian...**

- **CRH to Acquire Ash Grove Cement...**

- **PERMITTING - SEPTEMBER 2017...**

## FRAC SAND LATEST NEWS

### Athabasca Appoints Murray Chief Financial Officer

Athabasca Minerals Inc. announced the appointm Lucas Murray, CPA, CA, to the position of chief fir officer.

- **Hi-Crush Announces Start of Operation Pecos Terminal**

- **Twin Eagle Sand Logistics Acquires Ter**

- **U.S. Silica to Build Second Frac Sand Pl Permian**

- **Microsoft, Halliburton Collaborate on C Project**

More in Frac Sand

## RESOURCE CENTER

 10/12 Webinar: Drones in Mining Q&A

 Webinar: Using Drone Data for Mine Pl

 08/17 Webinar: Using Drone Data for Aggregates Inventory Management

 How to spot machine abuse

How to reduce idle times and boost pr

MOST POPULAR


**EXHIBIT**
**3**

- **Cemex Honored with Southern Californ Efficiency Award**

- **New Construction Starts Jump 14 Perc September**

- **MSHA Issues New Serious Accident Ale**

- **Granterock Helps Fire Victims Breathe**

- **Polaris Poised to Meet Increased Dema**

**More In  Latest News**

---

## CONTACT DETAILS

**SEMCO Publishing**
8751 E. Hampden Ave B1
Denver, CO 80231 USA
T: +1 (303) 283-0640
F: +1 (303) 283-0641
**info@semcopublishing.com**
**subscriptions@rockproducts.com**

## HELP AND SUPPORT

‣ **Subscription Services**
‣ **Contact Us**
‣ **Privacy Policy**





© 2017 SEMCO Publishir

E&MJ     COAL AGE     CONCRETE PRODUCTS     CEMENT AMERICAS     EQUIPO MINERO     C&D WORLD     ASIA MINER

✉ SUBSCRIBE    ☎ +1 604-639-4533

## Select Sands Announces Zigurds "Zig" Vitols as President & CEO



**EXHIBIT**

**4**

Select Sands Announces Zigurds "Zig" Vitols as President & CEO (http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

**VANCOUVER, BRITISH COLUMBIA – Dec. 23, 2016** – Select Sands Corp. ("Select Sands" or the "Company") (TSX VENTURE:SNS)(OTCQX:SLSDF) today announced that Zigurds "Zig" Vitols, the Company's current Chief Operating Officer, has been appointed President and CEO of the Company. Mr. Vitols will be replacing Rasool Mohammad, who will be taking on a new role as Chief Operating Officer of Select Sands and President of American Select Corp., a wholly owned U.S. subsidiary of Select Sands. Mr. Mohammad will be moving to Houston, Texas during 2017 and Mr. Vitols will continue to be based in Houston.

> "The Company is going through a very important transition period as we move towards production. I am very pleased to have Zig leading the Company during our next phase of growth," commented Rasool Mohammad. "Zig's skill set and experience will serve the Company well as we work to achieve full production status in 2017. More importantly, we continue to share a common vision of what the Company can achieve in the coming years."
>
> "The Company now enters the operational stage of its development and the Board of Directors has assembled a team that will continue to guide management in critical strategies and consequently management will take thoughtful and deliberate actions on its pathway to the next level," said the new CEO Zig Vitols. "Rasool Mohammad has been a key driver in the Company's development to this point and he will continue to focus on operational capabilities, M&A opportunities and assembling a first-rate operational team. The Company will maintain its initiative of growth in the industrial use markets while preparing operations to meet the resurgence of the Oil & Gas sector."

### About Select Sands Corp.

Select Sands Corp. is an industrial Silica Product company developing its 100% owned, 520-acre Northern White, Tier-1, silica sands project located in Arkansas, U.S.A. Select Sands' goal is to become a key supplier of premium industrial silica sand and frac sand to the North American markets. Select Sands' Arkansas property has a significant logistical advantage of being approximately 650 rail-miles closer to oil and gas markets located in Oklahoma, Texas, New Mexico, and Louisiana.

For more information about Select Sands Corp., please visit www.selectsandscorp.com (http://www.selectsandscorp.com/).

**Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accepts responsibility for the adequacy or accuracy of this Release.**

FORWARD-LOOKING INFORMATION

*This news release includes forward-looking information and statements, which may include, but are not limited to, information and statements regarding or inferring the future business, operations, financial performance, prospects, and other plans, intentions, expectations, estimates, and beliefs of the Company. Such statements include the Company's ability to achieve full production status in 2017. Information and statements which are not purely historical fact are forward-looking statements. Forward-looking information and statements involve and are subject to assumptions and known and unknown risks, uncertainties, and other factors which may cause actual events, results, performance, or achievements of the Company to be materially different from future events, results, performance, and achievements expressed or implied by forward-looking information and statements herein. Although the Company believes that any forward-looking information and statements herein are reasonable, in light of the use of assumptions and the significant risks and uncertainties inherent in such information and statements, there can be no assurance that any such forward-looking information and statements will prove to be accurate, and accordingly readers are advised to rely on their own evaluation of such risks and uncertainties and should not place undue reliance upon such forward-*

Select Sands Announces Zigurds "Zig" Vitols as President & CEO - Select Sands Corp

looking information and statements. Any forward-looking information and statements herein are made as of the date hereof, and except as required by applicable laws, the Company assumes no obligation and disclaims any intention to update or revise any forward-looking information and statements herein or to update the reasons that actual events or results could or do differ from those projected in any forward-looking information and statements herein, whether as a result of new information, future events or results, or otherwise, except as required by applicable laws.

CONTACT INFORMATION

Select Sands Corp.

Rasool Mohammad, B.Sc. (Mining)

President & CEO

(604) 639-4533

www.selectsandscorp.com (http://www.selectsandscorp.com)Investor Relations

Arlen Hansen

(604) 684-6730

SNS@kincommunications.com

Facebook (http://www.facebook.com/sharer/sharer.php?u=http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/&t=Select+Sands+Announces+Zigurds+%22Zig%22+Vitols+as+President+%26+CEO)

Twitter          Google+ (https://plus.google.com/share?url=http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

LinkedIn (http://www.linkedin.com/shareArticle?
mini=true&ro=true&trk=EasySocialShareButtons&title=Select+Sands+Announces+Zigurds+%22Zig%22+Vitols+as+President+%26+CEO&url=http://www.selectsandscorp.com/
sands-announces-zigurds-zig-vitols-president-ceo/)

E-mail (mailto:?subject=Visit this site http://www.selectsandscorp.com&body=Hi, this may be interesting you: "Select Sands Announces Zigurds "Zig" Vitols as President
& CEO"! This is the link  http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

News – 2017 (http://www.selectsandscorp.com/news/2017-releases/)

News – 2016 (http://www.selectsandscorp.com/news/2016-releases/)

News – 2015 (http://www.selectsandscorp.com/news/2015-releases/)

News – 2014 (http://www.selectsandscorp.com/news/2014-releases/)

News – 2013 (http://www.selectsandscorp.com/news/2013-releases/)

News – 2012 (http://www.selectsandscorp.com/news/2012-releases/)

News – 2011 (http://www.selectsandscorp.com/news/2011-releases/)

News – 2010 (http://www.selectsandscorp.com/news/2010-releases/)

In the Media (http://www.selectsandscorp.com/news/media/)

Latest News

Select Sands Reports Second Quarter 2017 Results (http://www.selectsandscorp.com/2017/08/15/select-sands-reports-second-quarter-2017-results/)
August 15, 2017

Select Sands Corporation Schedules Second Quarter 2017 Results Conference Call (http://www.selectsandscorp.com/2017/08/11/sns-schedules-second-quarter-2017-results-coference-call/) August 11, 2017

Select Sands Provides Operations Update (http://www.selectsandscorp.com/2017/06/27/select-sands-provides-operations-update/) June 27, 2017

Contact us

Select Sands Corp.
Suite 310, 850 W Hastings
Vancouver, BC,
Canada V6C 1E1

Phone: +1 604-639-4533
Fax: +1-604-669-2744
Email: info@selectsandscorp.com

American Select Corp is a US subsidiary of Select Sands Corp

Disclaimer (/disclaimer/)

Search

Search                                                                                          🔍

Subscribe

✉ CLICK HERE TO JOIN

2016 - Select Sands Corp