ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2018-Jul-20 13:09:30
60CV-17-6345
C06D06 : 44 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
SIXTH DIVISION

PROPST PROPERTIES, LLC PLAINTIFF

v. CASE NO. 60CV-17-6345

RASOOL MOHAMMAD; SELECT SANDS AMERICA CORPORATION; WESTBROOK WILLOW, LLC; and ZIGURDS VITOLS DEFENDANTS

**AMENDED COMPLAINT**

Propst Properties, LLC, for its amended complaint against Rasool Mohammad, Select Sands America Corporation, Westbrook Willow, LLC, and Zigurds Vitols, states:

**PARTIES, JURISDICTION, AND VENUE**

1. Propst Properties, LLC ("Propst") is a domestic limited liability company licensed to do business in the State of Arkansas, with its principal place of business located in Black Rock, Lawrence County, Arkansas.

2. Rasool Mohammad ("Mohammad") is an individual and a foreign citizen residing in Vancouver, British Columbia, Canada. Mohammad has extensive personal contacts with the State of Arkansas through his operation of Select Sands America Corporation and its subsidiaries, subdivisions, and affiliates, and for the reasons set forth below.

3. Select Sands America Corporation is a foreign for-profit corporation, licensed to do business in the State of Arkansas, with its principal place of business located in Vancouver, British Columbia, Canada. Select Sands America Corporation has extensive personal contacts with the State of Arkansas for the reasons set forth below. Select Sands America Corporation may be served through The Corporation Company, its registered agent for service of process.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

EXHIBIT
G

4. Westbrook Willow, LLC ("Westbrook") is a foreign limited liability company licensed to do business in the State of Texas, with its principal place of business located in Houston, Harris County, Texas. Westbrook has extensive personal contacts with the State of Arkansas for the reasons set forth below. Westbrook may be served through its counsel of record.

5. Zigurds Vitols ("Vitols") is an individual residing in Houston, Harris County, Texas. Vitols has extensive personal contacts with the State of Arkansas through his employment with and operation of Select Sands America Corporation and its subdivisions, subsidiaries, and affiliates, through his operation of Westbrook, and for the reasons set forth below.

6. This Court has jurisdiction over the parties to and the subject matter of this litigation pursuant to Arkansas Code Annotated §§ 16-4-101 and 16-58-120.

7. Propst and Westbrook have agreed that venue is proper in this Court. *See* Consultant Agreement ¶ 9, attached hereto and incorporated herein as Exhibit 1.

8. Venue is therefore proper in this Court as to Mohammad, Select Sands America Corporation, and Vitols pursuant to Arkansas Code Annotated § 16-60-101(e).

**FACTS**

9. Propst is engaged in the frac-sand and frac-proppant industries. Specifically, Propst owns real property in Lawrence County, Arkansas. The real property Propst owns allows for the placement of plants that process refined sand and limestone, and includes the necessary water, utility, and railway connections that allow for these processing plants to become operational.

10. Propst leases the real property that it owns to sand processors, who use the processing plants to refine the sand or limestone either mined from Propst's property or shipped

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

to the processing plants located on Propst's property from other mines. The refined sand or limestone is then shipped to customers for use in the hydraulic fracturing, or "fracking," industry.

11.     In the summer of 2014, Propst entered into a lease agreement with American Silica, LLC ("American Silica"), a sand processor.

12.     Pursuant to that lease, Propst leased real property in Lawrence County to American Silica to build a processing plant.

13.     After entering its lease with American Silica, Propst recognized a business opportunity to lease its remaining property in Lawrence County to other sand processors because it has the necessary lot space and the necessary water, utility, and railway connections to make additional processing plants operational and economically viable.

14.     Propst estimated that its remaining property could hold up to four additional processing plants.

15.     Propst, however, lacked the necessary market expertise and connections within the marketplace to market and lease its property on its own.

16.     On or before August 7, 2014, Propst began discussions with ZIGURDS VITOLS with the intention of entering into a consulting agreement with his company, WESTBROOK, so he could bring Propst lessors like American Silica.

17.     Vitols represented to Propst that he was uniquely qualified for this consulting relationship because he previously worked for Martin Marietta, another sand processor, and claimed to have extensive contacts in the sand-processing industry.

18.     Vitols also represented to Propst that he took early retirement from Martin Marietta.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

19.     In truth and in fact, however, Vitols was terminated from Martin Marietta, and Vitols never corrected his previous representation to Propst that he took early retirement.

20.     On August 7, 2014, Propst entered into a Consultant Agreement (the "Propst Agreement") with Westbrook. *See* Ex. 1.

21.     Pursuant to the Propst Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

22.     Pursuant to the Propst Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

23.     Pursuant to the Propst Agreement, Propst retained Westbrook "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst] (the 'Consulting Services')." Ex. 1 ¶ 1.

24.     Pursuant to the Propst Agreement, and "[i]n consideration for providing the Consulting Services," Propst agreed to pay Westbrook an hourly rate for its services on a monthly basis, but in any event the monthly payments to Westbrook would not be less than two thousand dollars. Ex. 1 ¶ 2(a).

25.     Pursuant to the Propst Agreement, and "[i]n consideration for providing the Consulting Services," Propst agreed to pay Westbrook "a ten percent (10%) commission on all gross revenues and income received by [Propst] related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future [if Propst] receive[d] monthly gross income in excess of twenty thousand dollars ($20,000)." Ex. 1 ¶ 2(a), (b).

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

26.    Shortly after the Propst Agreement was signed, Propst specifically asked Vitols to try and obtain business from La Ronge Gold Corporation.

27.    La Ronge Gold Corporation subsequently changed its name to Select Sands America Corporation in November 2014. For the purposes of this amended complaint, La Ronge Corporation and Select Sands America Corporation are collectively referred to as "SELECT SANDS."

28.    Propst also specifically asked Vitols to try and obtain business from Lehigh Hanson ("Hanson") and Cemex.

29.    Despite these express instructions and the Propst Agreement's express provision that Westbrook "advise, negotiate, and provide other services related to the frac proppant business . . . as reasonably requested by [Propst,]" Westbrook primarily sought to obtain business only from Select Sands.

30.    Vitols had a prior relationship with MOHAMMAD, who in 2014 was Select Sands' President and Chief Executive Officer.

31.    While President and Chief Executive Officer, and before Westbrook entered into the Propst Agreement, Propst contacted Mohammad to solicit him to lease the real property eventually leased to American Silica.

32.    Mohammad declined to lease the property from Propst at that time, but later and after the Propst Agreement was executed, he represented to Propst, through Vitols and Westbrook, that Select Sands was interested in leasing the remaining property from Propst.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

33.     In truth and in fact, however, neither Mohammad nor Select Sands had any intention of leasing property from Propst, and neither Mohammad, Select Sands, Vitols, nor Westbrook corrected their previous representations to Propst that they were.

34.     Instead, Mohmmad and Select Sands endeavored, with Vitols's and Westbrook's assistance, to use these misrepresentations and Vitols's and Westbrook's relationships with Propst to gain confidential, proprietary information about Propst's property and business to directly compete with Propst.

35.     Mohammad and Select Sands also endeavored, with Westbrook's and Vitols's assistance, to use these representations and Vitols's and Westbrook's relationships with Propst to prevent other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

36.     Vitols and Westbrook knowingly and willfully assisted Mohammad and Select Sands in these endeavors.

37.     Vitols and Westbrook spent several months after the Propst Agreement was signed encouraging Propst to pursue a lease agreement only with Select Sands.

38.     Vitols and Westbrook only offered token assistance in helping Propst obtain leases from Hanson and Cemex.

39.     And Vitols and Westbrook offered no assistance in helping Propst obtain leases from any other sand processors.

40.     In October and November 2014, moreover, Vitols engaged in extensive negotiations with Mohammad to obtain a position on Select Sands' board of directors.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

41. Mohammad told Vitols during these negotiations that his position on the board of directors would help Select Sands advance its project to own competing properties and establish a competing business to Propst's in the United States and Arkansas.

42. Mohammad also told Vitols during these negotiations that his position on the board of directors would eventually lead to a full-time, salaried position as Select Sands' Chief Operating Officer once the project proceeded to its advanced stages.

43. On December 3, 2014, Vitols was appointed to Select Sands' board of directors. *See* Press Release, attached hereto and incorporated herein as Exhibit 2.

44. In an effort to conceal the true nature of their actions from Propst, Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, assured Propst that Vitols's directorship would not interfere or in any way prohibit Westbrook from performing the Propst Agreement's terms.

45. Also in an effort to conceal the true nature of their actions from Propst, Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, deliberately concealed the fact that Vitols's appointment to Select Sands' board of directors would eventually lead to a full-time, salaried position as Select Sands' Chief Operating Officer.

46. Relying on these material misrepresentations and concealments, Propst continued to pay Westbrook pursuant to the Propst Agreement.

47. On July 21, 2015, Vitols was appointed as Select Sands' Chief Operating Officer. *See* Press Release, attached hereto and incorporated herein as Exhibit 3.

48. In an effort to conceal the true nature of their actions from Propst, Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, knowingly and willfully refused to notify Propst that Vitols accepted a position as Select Sands' Chief Operating Officer.

49. [redacted]

50. [redacted]

51. [redacted]

52. [redacted]

53. [redacted]

54. [redacted]

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

55. [redacted]

56. On or around October 5, 2016, Select Sands entered into a binding agreement (the "OPS Agreement") with Tutle Holding, LLC and Steve Hackman, Ozark Premium Sand, LLC (collectively, "Ozark Premium Sand"). *See* "Select Sands Agrees to Deal with Ozark Premium Sand," *RockProducts* (Oct. 5, 2016), attached hereto and incorporated herein as Exhibit 5.

57. Pursuant to the OPS Agreement, American Select Corporation ("American Select"), Select Sands' wholly owned subsidiary, holds the option to purchase "a 26-acre fully operational drying facility with storage located within 50 miles of Select Sands' quarry in Arkansas. The 26-acre facility is located on the Union Pacific Rail Line." *Id.*

58. If American Select exercises the option, Select Sands would be "transform[ed] . . . into a fully integrated, self-sufficient Tier 1 sand producer with capacity to process more than 600,000 [tons per year] with an excellent logistics and storage advantage[.]" *Id.*

59. "In addition, the facility [could] be easily expanded to increase the amount of sand that can be processed." *Id.*

60. Mohammad praised the agreement upon its announcement, stating, "'[Select Sands'] timing to become a new supplier of high-purity, finer mesh sand couldn't come at a better time for our shareholders.'" *Id.*

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

61.     In truth and in fact, however, Mohammad and Select Sands were notified by Vitols and Westbrook in June 2015, at the latest, that the property owned by Ozark Premium Sand was inferior to Propst's property.

62.     Notwithstanding, Mohammad and Select Sands, with Vitols's and Westbrook's assistance, proceeded to enter into the OPS Agreement with the specific purpose of becoming Propst's direct competitor.

63.     Upon the OPS Agreement's execution, Select Sands became Propst's direct competitor because it now possesses an option through American Select, a wholly owned subsidiary, to purchase a fully operational processing facility within close proximity to sand and limestone mines and with the necessary water, utility, and railway access to allow the facility to remain operational and economically viable.

64.     Select Sands therefore has an interest in leasing the facility to sand processors and competes with Propst for these potential lessees.

65.     Any lessee brought by Westbrook to Propst would also be Select Sands' direct competitor.

66.     Because American Select, Select Sands' wholly owned subsidiary, possesses an option to purchase a fully operational facility, Select Sands has an interest in ensuring that only American Silica leases real property from Propst and that any other sand processors lease real property from Select Sands.

67.     On or around December 23, 2016, Vitols was appointed to be Select Sands' President and Chief Executive Officer. *See* Press Release, attached hereto and incorporated herein as Exhibit 6.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

68. The same day, Mohammad was announced as Select Sands' Chief Operating Officer and American Select's President and Chief Executive Officer. *See id.*

69. In an effort to conceal the true nature of their actions from Propst, Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, knowingly and willfully refused to notify Propst that Vitols accepted positions as Select Sands' President and Chief Executive Officer.

70. [redacted]

71. [redacted]

72. [redacted]

73. [redacted]

74. [redacted]

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

75. Vitols's assistance to Select Sands and his acceptance of positions as Select Sands' Chief Operating Officer and, later, as its President and Chief Executive Officer while the Propst Agreement remained in full force and effect were blatant conflicts of interest.

76. Vitols's assistance to Select Sands [REDACTED] while the Propst Agreement remained in full force and effect were blatant conflicts of interest.

77. Westbrook's assistance to Select Sands [REDACTED] while the Propst Agreement remained in full force and effect were blatant conflicts of interest.

78. And Vitols's and Westbrook's assistance to Select Sands and their participation in Select Sands' acceptance of the OPS Agreement while the Propst Agreement remained in full force and effect were blatant conflicts of interest.

79. Mohammad and Select Sands were aware of the Propst Agreement and proceeded to invite and entice Vitols to assist Select Sands, accept positions as Select Sands' Chief Operating Officer and, later, as its President and Chief Executive Officer, [REDACTED] to Propst's detriment.

80. Mohammad and Select Sands, aware of the Propst Agreement, proceeded to invite and entice Westbrook to assist Select Sands [REDACTED] to Propst's detriment.

81. And Mohammad and Select Sands, aware of the Propst Agreement, proceeded to invite and entice Vitols and Westbrook to assist Select Sands and participate in Select Sands' acceptance of the OPS Agreement to Propst's detriment.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

82. Westbrook cannot possibly perform the Propst Agreement because Select Sands is Propst's direct competitor, Vitols accepted positions as Select Sands' Chief Operating Officer and, later, as its President and Chief Executive Officer, [REDACTED]

83. Westbrook also cannot possibly perform the Propst Agreement because Select Sands is Propst's direct competitor [REDACTED]

84. Westbrook cannot direct business from Select Sands to Propst because that would breach Vitols's fiduciary duties to Select Sands [REDACTED]

85. Westbrook cannot direct business from Hanson or Cemex to Propst because that would breach Vitols's fiduciary duties to Select Sands [REDACTED]

86. And Westbrook cannot direct business from any other sand processors to Propst because that would breach Vitols's fiduciary duties to Select Sands [REDACTED]

87. It was incumbent on Vitols and Westbrook to inform Propst of Vitols's positions of employment with Select Sands, [REDACTED] and the fact that Westbrook was no longer able to perform the Propst Agreement's basic objectives, but Vitols and Westbrook failed to do so.

88. It was incumbent on Mohammad and Select Sands, with full knowledge of the Propst Agreement, to not do anything that would improperly interfere with the Propst Agreement,

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

but Mohammad and Select Sands proceeded to invite and entice Vitols to accept positions of employment with Select Sands, [REDACTED] [REDACTED] that made Westbrook's performance of the Propst Agreement impossible.

89. As of the date of this filing, Propst has paid Westbrook $91,000.00 pursuant to the Agreement.

90. Westbrook accepted these money payments without objection or hesitation. Westbrook, moreover, failed to take the opportunity upon receipt of money payments to disclose Vitols's new employment with Select Sands (or his negotiations with Mohammad regarding this employment), [REDACTED] or the fact that Westbrook's performance of the Propst Agreement was impossible.

91. Instead, on a January 2017 telephone call with Paul Propst, after receiving the December 2016 payment from Propst, Vitols said, "I don't feel like I've done anything to deserve this." Notwithstanding, Westbrook neither returned any portions of the money payments it received nor offered to do so.

92. Propst's money payments do not include continuing amounts that will become due and payable pursuant to the Propst Agreement. *See* Ex. 1.

93. As of the date of this filing, Westbrook has not returned any of the money payments it received.

94. Also as of the date of this filing, Westbrook has not provided Propst with any viable business opportunities from Select Sands, Hanson, Cemex, or any other sand processors, despite

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

the Propst Agreement's express provisions to do so and Vitols's and Westbrook's express representations to Propst that they would.

95.     Mohammad, Select Sands, Vitols, and Westbrook knew that Propst leased some of the real property that it owned to American Silica to build a processing plant.

96.     Mohammad, Select Sands, Vitols, and Westbrook knew American Silica's processing plant was operational and economically viable.

97.     Mohammad, Select Sands, Vitols, and Westbrook knew that Propst held valid and recognizable prospective business relationships with other sand processors, such as Hanson and Cemex, because it had the necessary lot space and the necessary railway connections to make additional processing plants operational and economically viable.

98.     Mohammad, Select Sands, Vitols, and Westbrook knew that Propst expected to lease its property to four additional sand processors.

99.     Mohammad, Select Sands, Vitols, and Westbrook knew that Propst was actively engaged in obtaining additional sand-processor lessees for its property.

100.    Mohammad, Select Sands, Vitols, and Westbrook knew that Propst specifically contracted with Westbrook to obtain additional sand-processor lessees through Vitols's claimed extensive contacts in the sand-processing industry.

101.    And Mohammad, Select Sands, Vitols, and Westbrook were aware in June 2015, at the latest, that Propst's property was superior to other sites in Arkansas that were available to sand processors, including Ozark Premium Sands'.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

102. Notwithstanding this knowledge, Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully participated in a scheme to deprive Propst of the sand-processor lessees it expected through fraudulent, deceptive, and improper means.

103. By way of example only, Mohammad and Select Sands, by themselves and through Vitols and Westbrook with their knowledge and consent, misrepresented to Propst that Select Sands was interested in leasing Propst's remaining property.

104. In truth and in fact, however, Mohammad, Select Sands, Vitols, and Westbrook endeavored to use these misrepresentations to gain confidential, proprietary information from Propst.

105. Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, encouraged Propst to pursue a lease agreement only with Select Sands.

106. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst that Mohammad, Select Sands, and Vitols were negotiating for Vitols to obtain positions of full-time employment with Select Sands.

107. Vitols and Westbrook, with Mohammad's and Select Sands' knowledge and consent, misrepresented to Propst that Vitols's appointment to Select Sands' board or directors would not interfere or in any way prohibit Westbrook from performing the Propst Agreement's terms.

108. Mohmmad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst Vitols's appointment to positions of full-time employment with Select Sands as its Chief Operating Officer and, later, as its President and Chief Executive Officer.

109. [redacted]

110. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst Vitols's and Westbrook's assistance and participation in Select Sands' acceptance of the OPS Agreement.

111. Before and continuing after the OPS Agreement's execution, Vitols and Westbrook knowingly and willfully misrepresented, with Mohammad's and Select Sands' knowledge and consent, that Vitols and Westbrook were performing the Propst Agreement and were actively soliciting and negotiating with other sand processors.

112. In truth and in fact, however, neither Vitols nor Westbrook engaged in any meaningful efforts to obtain business for Propst from any other sand processors after Vitols accepted a position as Select Sands' Chief Operating Officer.

113. As of the date of this filing, only American Select has leased property from Propst.

**COUNT I – CONSPIRACY**

114. Propst incorporates paragraphs 1 through 113 by reference.

115. For the reasons set forth above and below, Select Sands and Westbrook, by themselves and through Mohammad and Vitols, combined to accomplish purposes that are unlawful and oppressive.

116. In the alternative to paragraph 115, and for the reasons set forth above and below, Select Sands and Westbrook, by themselves and through Mohammad and Vitols, combined to

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

accomplish purposes, not in themselves unlawful, oppressive, or immoral, but through unlawful, oppressive, or immoral means.

117. By way of example only, Westbrook, by itself and through Vitols, with Mohammad's and Select Sands' knowledge and consent, knowingly and willfully breached its fiduciary duties to Propst.

118. Westbrook, by itself and through Vitols, with Mohammad's and Select Sands' knowledge and consent, knowingly and willfully breached the Propst Agreement.

119. Westbrook, by itself and through Vitols, with Mohammad's and Select Sands' knowledge and consent, knowingly, willfully, and unjustly enriched itself at Propst's expense.

120. Westbrook, through Vitols, and with Mohammad's and Select Sands' knowledge and consent, knowingly and willfully made material misrepresentations and omissions of fact to Propst, before and after the Propst Agreement was signed, for the purposes of inducing Propst to enter into the Propst Agreement, to continue to make payments to Westbrook pursuant to the Propst Agreement, to gain confidential, proprietary information about Propst's property and business, and to prevent other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

121. Select Sands, by itself and through Mohammad and Vitols, with Westbrook's knowledge and consent, knowingly and willfully participated in a scheme to cause Westbrook to breach the Propst Agreement.

122. And Select Sands and Westbrook, with Mohammad's and Vitols's assistance, knowledge, and consent, knowingly and willfully participated in a scheme to deprive Propst of the sand-processor lessees it expected through fraudulent, deceptive, and improper means.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

123. As a direct and proximate result of Select Sands' and Westbrook's acts committed in furtherance of and pursuant to these schemes, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

124. Select Sands' and Westbrook's actions were intentionally pursued for the purpose of causing damage, Select Sands and Westbrook knew or should have known their conduct would naturally and probably result in damage, and Select Sands and Westbrook carried on with malice and in reckless disregard of the consequences.

125. Select Sands' and Westbrook's actions were also affirmative acts of concealment, fraudulent, furtively planned, and secretly executed as to keep Propst's cause of action concealed.

126. In the alternative to paragraph 125, Select Sands' and Westbrook's actions were perpetrated in such a way that they concealed themselves.

**COUNT II – BREACH OF FIDUCIARY DUTY**

127. Propst incorporates paragraphs 1 through 126 by reference.

128. At all relevant times and for the reasons set forth above, Westbrook acted as Propst's agent.

129. Pursuant to that agency relationship, Westbrook owed certain fiduciary duties to Propst, including but not limited to fiduciary duties of utmost good faith and loyalty, to avoid acting adversely to Propst's interests, to not acquire a private interest in opposition to Propst, and to avoid self-dealing and conflicts of interest. *See Cole v. Laws*, 349 Ark. 177, 76 S.W.3d 878 (2002); *Collins v. Heitman*, 225 Ark. 666, 284 S.W.2d 628 (1955); *Yahrus v. Continental Oil Co.*, 218 Ark. 872, 239 S.W.2d 594 (1951).

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

130. Westbrook, by itself and through Vitols, breached its fiduciary duties to Propst.

131. Westbrook misrepresented to Propst, before and after the Propst Agreement was signed, that Vitols took early retirement from Martin Marietta when, in truth and in fact, Vitols was terminated from Martin Marietta.

132. Westbrook misrepresented Select Sands' interest in leasing property from Propst when, in truth and in fact, Westbrook knew Select Sands never had any intention of leasing property from Propst, and that Select Sands and Westbrook endeavored to gain confidential, proprietary information about Propst's property to directly compete with Propst.

133. Westbrook misrepresented Select Sands' interest in leasing property from Propst when, in truth and in fact, Select Sands and Westbrook endeavored to use these misrepresentations to prevent other sand processors from leasing properties owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

134. Notwithstanding, Westbrook encouraged Propst to pursue a lease agreement only with Select Sands.

135. Westbrook only offered token assistance in helping Propst obtain leases from Hanson and Cemex.

136. And Westbrook offered no assistance in helping Propst obtain leases from any other sand processors.

137. Westbrook knowingly and willfully concealed from Propst Vitols's negotiations with Mohammad and Select Sands for a full-time, salaried position with Select Sands that would make its performance of the Propst Agreement impossible.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

138.    Westbrook misrepresented to Propst that Vitols's appointment to Select Sands' board of directors would neither interfere with nor prohibit its performance of the Propst Agreement.

139.    Westbrook allowed Vitols to accept positions of employment with Select Sands as its Chief Operating Officer and, later, as its President and Chief Executive Officer when it knew Vitols's acceptance of these positions of employment were blatant conflicts of interest and would make its performance of the Propst Agreement impossible.

140.    Westbrook knowingly and willfully concealed Vitols's acceptance of these positions of employment and their inherent conflicts of interest from Propst.

141.    

142.

143.    Westbrook assisted and participated in Select Sands' acceptance of the OPS Agreement.

144.    Westbrook knowingly and willfully concealed its assistance and participation in Select Sands' acceptance of the OPS Agreement from Propst.

145.    Westbrook knowingly and willfully participated in a scheme to deprive Propst of the sand-processor lessees it expected through fraudulent, deceptive, and improper means.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

146. Westbrook knowingly and willfully misrepresented to Propst that it was performing the Propst Agreement and was actively soliciting and negotiating with other sand processors when, in truth and in fact, Westbrook had not engaged in any meaningful efforts to obtain business for Propst from any other sand processors after Vitols accepted a position as Select Sands' Chief Operating Officer.

147. As a direct and proximate result of Westbrook's breaches of its fiduciary duties to Propst, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

148. Westbrook's actions were intentionally pursued for the purpose of causing damage, Westbrook knew or should have known its conduct would naturally and probably result in damage, and Westbrook carried on with malice and in reckless disregard of the circumstances.

149. Westbrook's actions were also affirmative acts of concealment, fraudulent, furtively planned, and secretly executed to keep Propst's cause of action concealed.

150. In the alternative to paragraph 149, Westbrook's actions were perpetrated in such a way that they concealed themselves.

**COUNT III – BREACH OF CONTRACT**

151. Propst incorporates paragraphs 1 through 150 by reference.

152. Pursuant to the Propst Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

153. Pursuant to the Propst Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

154. Pursuant to the Propst Agreement, Westbrook agreed "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst] (the 'Consulting Services')." Ex. 1 ¶ 1.

155. And pursuant to the Propst Agreement, Propst agreed to make money payments to Westbrook "[i]n consideration for providing the Consulting Services." Ex. 1 ¶ 2(a), (b).

156. Additionally, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *West Memphis Adolescent Residential, LLC v. Compton*, 2010 Ark. App. 450, 5, 374 S.W.3d 922, 925. "Moreover, a party has an implied obligation not to do anything that would prevent, hinder, or delay performance." *Id.* at 5–6, 374 S.W.3d at 925.

157. Propst performed its express obligations under the Propst Agreement, and has not waived its right to insist upon full and complete performance of the Propst Agreement.

158. Propst performed its implied obligations under the Propst Agreement, and has not engaged in any activity that prevented, hindered, or delayed either its or Westbrook's performance of the Propst Agreement.

159. Westbrook, through Vitols, breached the Propst Agreement's express and implied terms.

160. Westbrook misrepresented to Propst, before and after the Propst Agreement was signed, that Vitols took early retirement from Martin Marietta when, in truth and in fact, Vitols was terminated from Martin Marietta.

161. Propst specifically asked Westbrook to try and obtain business from Hanson, Cemex, and other sand processors.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

162.    Despite these express instructions and the Propst Agreement's express provision that Westbrook "advise, negotiate, and provide other services related to the frac proppant business . . . as reasonably requested by [Propst,]" Westbrook primarily sought to obtain business only from Select Sands. Ex. 1 ¶ 1.

163.    Westbrook only offered token assistance in helping Propst obtain leases from Hanson and Cemex.

164.    And Westbrook offered no assistance in helping Propst obtain leases from any other sand processors.

165.    Westbrook, moreover, misrepresented Select Sands' interest in leasing property from Propst when, in truth and in fact, Westbrook knew Select Sands never had any intention of leasing property from Propst, and that Select Sands and Westbrook endeavored to gain confidential, proprietary information about Propst's property to directly compete with Propst.

166.    Westbrook also misrepresented Select Sands' interest in leasing property from Propst when, in truth and in fact, Select Sands and Westbrook endeavored to use these misrepresentations to prevent other sand processors from leasing properties owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

167.    Westbrook knowingly and willfully concealed Vitols's negotiations with Mohammad and Select Sands for a full-time, salaried position with Select Sands that would make its performance of the Propst Agreement impossible.

168.    Westbrook misrepresented to Propst that Vitols's appointment to Select Sands' board of directors would neither interfere with nor prohibit its performance of the Propst Agreement.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

169. Westbrook allowed Vitols to accept positions of employment with Select Sands as its Chief Operating Officer and, later, as its President and Chief Executive Officer when it knew Vitols's acceptance of these positions of employment were blatant conflicts of interest that would make its performance of the Propst Agreement impossible.

170.

171. Westbrook's performance of the Propst Agreement is impossible because it cannot direct business from Select Sands, Hanson, Cemex, or any other sand processor because that would breach Vitols's fiduciary duties to Select Sands even though Propst, the Propst Agreement, and Propst's instructions to Westbrook specifically directed Westbrook to attempt to obtain business from Select Sands, Hanson, Cemex, and other sand processors.

172. Notwithstanding, Westbrook continued to accept money payments from Propst without objection or hesitation, and knowingly and willfully concealed Vitols's acceptance of these positions of employment and their inherent conflicts of interest from Propst.

173.

174.



**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

175.   Westbrook assisted and participated in Select Sands' acceptance of the OPS Agreement to Propst's detriment.

176.   Westbrook knowingly and willfully concealed its assistance and participation in Select Sands' acceptance of the OPS Agreement from Propst.

177.   Westbrook knowingly and willfully participated in a scheme to deprive Propst of the sand-processor lessees it expected through fraudulent, deceptive, and improper means to Propst's detriment.

178.   Westbrook knowingly and willfully misrepresented to Propst that it was performing the Propst Agreement and was actively soliciting and negotiating with other sand processors when, in truth and in fact, Westbrook had not engaged in any meaningful efforts to obtain business for Propst from any other sand processors after Vitols accepted a position as Select Sands' Chief Operating Officer.

179.   Due to Westbrook's breaches of the Propst Agreement, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

180.   Propst is entitled to pre-judgment and post-judgment interest in the greatest amount allowed by law.

181.   Propst is entitled to its attorneys' fees and costs pursuant to Arkansas Code Annotated § 16-22-308 and Arkansas Rule of Civil Procedure 54.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

**COUNT IV – UNJUST ENRICHMENT**

182. Propst incorporates paragraphs 1 through 181 by reference.

183. In return for money payments from Propst, Westbrook promised "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by Propst." Ex. 1 ¶ 1.

184. In return for money payments from Propst, Westbrook promised to make reasonable efforts to obtain and secure business from Select Sands, Hanson, Cemex, and other sand processors, as reasonably requested by Propst.

185. Propst, relying on Westbrook's promises, made money payments to Westbrook.

186. Westbrook refused to honor its promises to Propst to make reasonable efforts to obtain and secure business for Propst from Select Sands, Hanson, Cemex, and other sand processors, as specifically requested by Propst.

187. Westbrook has refused to honor its promises to Propst by allowing Vitols to accept positions of employment [REDACTED] creating blatant conflicts of interest that makes Westbrook's performance of the Propst Agreement impossible.

188. [REDACTED]

189. It is unjust for Westbrook to refuse to honor its promises to Propst.

190. It is unjust for Propst to have made money payments to Westbrook when Westbrook refused to honor its promises to Propst.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

191. It is unjust for Westbrook to have accepted these money payments without objection or hesitation, with full knowledge that it failed to honor its promises to Propst and that it has allowed blatant conflicts of interest to arise that makes its performance of the Propst Agreement impossible.

192. It is unjust for Westbrook to have accepted these money payments without informing Propst about Vitols's acceptance of positions of employment with Select Sands [REDACTED] that makes Westbrook's performance of the Propst Agreement impossible.

193. [REDACTED]

194. As a result of Westbrook's failure to honor its promises to Propst, Propst has suffered damages in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases, and including but not limited to its money payments to Westbrook and its attorneys' fees and costs incurred in this action.

195. Westbrook's actions were also affirmative acts of concealment, fraudulent, furtively planned, and secretly executed to keep Propst's cause of action concealed.

196. In the alternative to paragraph 195, Westbrook's actions were perpetrated in such a way that they concealed themselves.

**COUNT V – FRAUD**

197. Propst incorporates paragraphs 1 through 196 by reference.

198. Vitols and Westbrook made false representations of fact to Propst.

199. Vitols and Westbrook also concealed material information from and failed to disclose pertinent information to Propst.

200. Vitols and Westbrook falsely represented to Propst that Vitols took early retirement from Martin Marietta when, in truth and in fact, Vitols was terminated from Martin Marietta.

201. Vitols and Westbrook concealed and failed to disclose that Vitols engaged in extensive negotiations with Select Sands in October and November 2014 to obtain a position on Select Sands' board of directors that would eventually lead to a full-time, salaried position as Select Sands' Chief Operating Officer.

202. Vitols and Westbrook falsely represented to Propst that Vitols's appointment to Select Sands' board of directors would not interfere with or in any way prohibit Westbrook from performing the Propst Agreement.

203. Vitols and Westbrook concealed and failed to disclose that Vitols accepted a position of employment as Select Sands' Chief Operating Officer.

204. Vitols and Westbrook concealed and failed to disclose that Vitols accepted a position of employment as Select Sands' President and Chief Executive Officer.

205. [redacted]

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

206. [REDACTED]

207. Vitols and Westbrook falsely represented to Propst that they were performing the Propst Agreement and were actively soliciting and negotiating with other sand processors when, in truth and in fact, neither Vitols nor Westbrook engaged in any meaningful efforts to obtain business for Propst from any other sand processors after Vitols accepted a position as Select Sands' Chief Operating Officer.

208. Vitols and Westbrook knew that their representations were false.

209. In the alternative to paragraph 208, Vitols and Westbrook knew that they did not have a sufficient basis of information to make their representations.

210. Vitols and Westbrook intended to induce Propst to act or refrain from acting in reliance upon their misrepresentations, concealments, and failures to disclose pertinent information to Propst.

211. Vitols and Westbrook knew or should have known that Propst would not have entered into the Propst Agreement, would have terminated the Propst Agreement for cause, and would not have continued to make money payments to Westbrook pursuant to the Propst Agreement if they informed Propst that Vitols was terminated from Martin Marietta.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

212. Vitols and Westbrook also knew or should have known that Propst would have terminated the Propst Agreement for cause and would not have continued to make money payments to Westbrook pursuant to the Propst Agreement if they informed Propst that:

a. Vitols was engaged in extensive negotiations with Select Sands in October and November 2014 to obtain a position on Select Sands' board of directors that would eventually lead to a full-time, salaried position as Select Sands' Chief Operating Officer;

b. Vitols's appointment to Select Sands' board of directors would interfere with and prohibit Westbrook from performing the Propst Agreement;

c. Vitols accepted positions of employment as Select Sands' Chief Operating Officer and, later, as its President and Chief Executive Officer;

d. [redacted]

e. [redacted]

213. Vitols and Westbrook also specifically intended to induce Propst to make money payments pursuant to the Propst Agreement and to refrain from terminating the Propst Agreement for cause by falsely representing to Propst that they were performing the Propst Agreement and were actively soliciting and negotiating with other sand processors when, in truth and in fact, they were not and had not since Vitols accepted a position as Select Sands' Chief Operating Officer.

214. For the reasons set forth above, Propst justifiably relied on Vitols's and Westbrook's misrepresentations, concealment of material facts, and nondisclosure of pertinent information.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

215. As a direct and proximate result of Vitols's and Westbrook's frauds, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

216. Vitols's and Westbrook's actions were intentionally pursued for the purpose of causing damage, Vitols and Westbrook knew or should have known their conduct would naturally and probably result in damage, and Vitols and Westbrook carried on with malice and in reckless disregard of the circumstances.

217. Vitols's and Westbrook's actions were also affirmative acts of concealment, fraudulent, furtively planned, and secretly executed to keep Propst's cause of action concealed.

218. In the alternative to paragraph 217, Vitols's and Westbrook's actions were perpetrated in such a way that they concealed themselves.

**COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT**

219. Propst incorporates paragraphs 1 through 218 by reference.

220. Through the Propst Agreement, Propst had a valid contractual relationship with Westbrook.

221. Mohammad and Select Sands had knowledge of the Propst Agreement.

222. Mohammad and Select Sands intentionally and improperly interfered, induced, and caused Westbrook's disruption, breach, and termination of the Propst Agreement.

223. Mohammad and Select Sands knowingly and willfully engaged in extensive, secret negotiations with Vitols to offer him a position on Select Sands' board of directors that would later lead to a full-time, salaried position as Select Sands' Chief Operating Officer.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

224. Mohammad and Select Sands knowingly and willfully invited and enticed Vitols to accept a position as Select Sands' Chief Operating Officer that created conflicts of interest with Propst and made Westbrook's performance of the Propst Agreement impossible.

225. Mohammad and Select Sands knowingly and willfully invited and enticed Vitols to accept positions as Select Sands' President and Chief Executive Officer that created conflicts of interest with Propst and made Westbrook's performance of the Propst Agreement impossible.

226. [redacted]

227. [redacted]

228. As a direct and proximate result of Mohammad's and Select Sands' tortious interferences with the Propst Agreement, Propst has been damaged in an amount to be proven at the trial of this matter but in excess than the amount required for federal jurisdiction in diversity-of-citizenship cases.

229. Mohammad's and Select Sands' actions were intentionally pursued for the purpose of causing damage, Mohammad and Select Sands knew or should have known their conduct would naturally and probably result in damage, and Mohammad and Select Sands carried on with malice and in reckless disregard of the circumstances.

230. Mohammad and Select Sands' actions were also affirmative acts of concealment, fraudulent, furtively planned, and secretly executed to keep Propst's cause of action concealed.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

231. In the alternative to paragraph 230, Mohammad's and Select Sands' actions were perpetrated in such a way that they concealed themselves.

**COUNT VII – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES**

232. Propst incorporates paragraphs 1 through 231 by reference.

233. Propst had valid business expectancies with Hanson, Cemex, and other sand processors because its property has the necessary lot space and the necessary water, utility, and railway connections to make up to four additional processing plants operational and economically viable.

234. Mohammad, Select Sands, Vitols, and Westbrook knew that Propst had valid business expectancies with Hanson, Cemex, and other sand processors.

235. Mohammad, Select Sands, Vitols, and Westbrook knew that Propst leased some of the real property that it owned to American Silica to build a processing plant.

236. Mohammad, Select Sands, Vitols, and Westbrook knew American Silica's processing plant was operational and economically viable.

237. Mohammad, Select Sands, Vitols, and Westbrook knew that Propst was actively engaged in obtaining additional sand-processor lessees for its property.

238. Mohammad, Select Sands, Vitols, and Westbrook knew that Propst specifically contracted with Westbrook to obtain additional sand-processor lessees through Vitols's claimed extensive contacts in the sand-processing industry.

239. Mohammad, Select Sands, Vitols, and Westbrook were aware in June 2015, at the latest, that Propst's property was superior to other sites in Arkansas that were available to sand processors, including Ozark Premium Sands'.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

240. Mohammad, Select Sands, Vitols, and Westbrook intentionally and improperly interfered, induced, and caused a disruption and termination of Propst's business expectancies.

241. By way of example only, Mohammad, Select Sands, Vitols, and Westbrook misrepresented to Propst that Select Sands was interested in leasing Propst's remaining property when, in truth and in fact, they knowingly and willfully endeavored to use these misrepresentations and Vitols's and Westbrook's relationships with Propst to gain confidential, proprietary information about Propst's property and business to directly compete with Propst.

242. Mohammad, Select Sands, Vitols, and Westbrook also knowingly and willfully endeavored to use these misrepresentations and Vitols's and Westbrook's relationships with Propst to prevent Hanson, Cemex, and other sand processors from leasing property from Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

243. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst their secret negotiations to offer Vitols a position on Select Sands' board of directors that would eventually lead to a full-time salaried position as Select Sands' Chief Operating Officer.

244. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst Vitols's acceptance of a position as Select Sands' Chief Operating Officer that created conflicts of interest with Propst that made it impossible for Westbrook to obtain business from Hanson, Cemex, or any other sand processors.

245. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst Vitols's acceptance of positions as Select Sands' President and Chief

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

Executive Officer that created conflicts of interest with Propst that made it impossible for Westbrook to obtain business from Hanson, Cemex, or any other sand processors.

246. [REDACTED]

247. [REDACTED]

248. Mohammad, Select Sands, Vitols, and Westbrook knowingly and willfully concealed from Propst Vitols's and Westbrook's assistance and participation in the OPS Agreement with the specific purpose of allowing Select Sands to become Propst's direct competitor.

249. Vitols and Westbrook knowingly and willfully misrepresented to Propst, with Mohammad's and Select Sands' knowledge and consent, that Vitols and Westbrook were performing the Propst Agreement were actively soliciting and negotiating with other sand processors when, in truth and in fact, neither Vitols nor Westbrook engaged in any meaningful efforts to obtain business for Propst from Hanson, Cemex, or any other sand processors after Vitols accepted a position as Select Sands' Chief Operating Officer.

250. As a direct and proximate result of Mohammad's, Select Sands', Vitols's, and Westbrook's tortious interferences with Propst's business expectancies, Propst has been damaged

in an amount to be proven at the trial of this matter but in excess than that required for federal jurisdiction in diversity-of-citizenship cases.

251. Mohammad's, Select Sands', Vitols's, and Westbrook's actions were intentionally pursued for the purpose of causing damage, they knew or should have known their conduct would naturally and probably result in damage, and they carried on with malice and in reckless disregard of the circumstances.

252. Mohammad's, Select Sands', Vitols's, and Westbrook's actions were also affirmative acts of concealment, furtively planned, and secretly executed to keep Propst's cause of action concealed.

253. In the alternative to paragraph 252, Mohammad's, Select Sands', Vitols's, and Westbrook's actions were perpetrated in such a way that they concealed themselves.

**COUNT VIII – DECLARATORY JUDGMENT**

254. Propst incorporates paragraphs 1 through 253 by reference.

255. Under Arkansas law, "when performance of a duty under a contract is contemplated, any nonperformance is a breach [and] the failure of one party to perform his contractual obligations releases the other party from his obligations." *Arkansas Realtors Ass'n v. Real Forms, LLC*, 2014 Ark. 385, 10, 445 S.W.3d 845, 852.

256. Additionally, "the essential elements of a contract are (1) competent parties, (2) subject matter, (3) *legal consideration*, (4) mutual agreement, and (5) mutual obligation." *Bank of the Ozarks, Inc. v. Walker*, 2016 Ark. 116, 2, 487 S.W.3d 808, 810 (emphasis added).

257. "[F]ailure of consideration, total or partial, occurs when the consideration is good and sufficient at the time the agreement is made, by some breach of contract, mistake or accident,

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

has afterwards failed." *Ozark Diamond Mines Corp. v. Townes*, 117 Ark. 552, 174 S.W. 151, 153 (1915).

258.    When a contract's consideration fails, the contract is broken. *See Puckett v. United States*, 556 U.S. 129, 137 (2009) (citing 23 R. Lord, Williston on Contracts § 63.1 (4th ed. 2002)). Accordingly, "[t]he party injured by the breach will generally be entitled to some remedy, which might include the right to rescind the contract entirely[.]" *Id.* (citing 23 R. Lord, Williston on Contracts § 68.1 (4th ed. 2003)).

259.    Pursuant to the Propst Agreement, Westbrook "provides consulting, advising, negotiation, and other services to frac proppant businesses." Ex. 1 at Preamble.

260.    Pursuant to the Propst Agreement, Propst "desires to engage [Westbrook] and [Westbrook] desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to [Propst]." Ex. 1 at Preamble.

261.    Pursuant to the Propst Agreement, Westbrook agreed "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by Propst (the 'Consulting Services')." Ex. 1 ¶ 1.

262.    And pursuant to the Propst Agreement, Propst agreed to make money payments to Westbrook "[i]n consideration for providing the Consulting Services[.]" Ex. 1 ¶ 2(a), (b).

263.    For the reasons set forth above in Count III, the Propst Agreement is impossible to perform because Westbrook cannot direct business from Select Sands, Hanson, Cemex, or any other sand processor to Propst without breaching Vitols's fiduciary duties to Select Sands ████

████████████

264. Because the Propst Agreement specifically contemplates Westbrook's provision of "Consulting Services" as its consideration, and Westbrook cannot now perform the "Consulting Services" due to Vitols's conflicts of interest [REDACTED] the Propst's Agreement's consideration has failed, and Propst is entitled to a declaratory judgment that the Propst Agreement is rescinded.

265. Additionally and for the reasons set forth in Count III, Westbrook breached the express terms of the Propst Agreement by failing "to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by [Propst]." Ex. 1 ¶ 1.

266. Also for the reasons set forth in Count III, Westbrook breached the Propst Agreement's implied terms of good faith and fair dealing, and the Propst Agreement's implied terms not to do anything that would prevent, hinder, or delay either its or Propst's performance of the Propst Agreement. *See West Memphis Adolescent Residential, LLC*, 2010 Ark. App. 450, at 5, 374 S.W.3d at 925.

267. Westbrook's breaches of the Propst Agreement were material, because performing the Propst Agreement's basic objectives as specifically directed by Propst and the Propst Agreement and preventing blatant conflicts of interest that would make Westbrook's performance of the Propst Agreement impossible were "essential term[s] or condition[s] that substantially defeat[ed] the purpose of the [Propst Agreement] for [Propst]." *Spann v. Lovett & Co., Ltd.*, 2012 Ark. App. 107, 21, 389 S.W.3d 77, 93.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

268. Accordingly and due to these material breaches of the Propst Agreement, Arkansas law demands that this Court declare the Propst Agreement to be at its end. *See Arkansas Realtors Ass'n*, 2014 Ark. 385, at 10, 442 S.W.3d at 852.

269. Propst is therefore entitled to a declaratory judgment that Westbrook's breaches of the Propst Agreement, as more fully described in Count III, were material.

270. Propst is also therefore entitled to a declaratory judgment that the Propst Agreement is now null and void and no longer in full force and effect due to Westbrook's material breaches of the Propst Agreement.

**COUNT IX – REPLEVIN**

271. Propst incorporates paragraphs 1 through 270 by reference.

272. Select Sands and Westbrook are in possession of Propst's property. Specifically, Select Sands and Westbrook are in possession of business records belonging to Propst, including but not limited to any Plant/Terminal Lease Agreements. *See* Affidavit of James F. Propst, attached hereto and incorporated herein as Exhibit 8, at ¶ 2.

273. The actual value of Propst's property that is in Select Sands' and Westbrook's possession cannot be quantified because it is confidential, proprietary, and contains trade secrets. To the extent that a value is required, Propst estimates that the value of the confidential, proprietary, and trade-secret information is greater than $1,000,000.00. *See* Ex. 8 ¶ 3.

274. Propst is the owner of the property and has a special ownership and interest in the property because it is confidential, proprietary, and contains trade secrets. *See* Ex. 8 ¶ 4.

275. Select Sands and Westbrook have wrongfully detained this property because they obtained it through material misrepresentations about Select Sands' interest in leasing property

from Propst when, in truth and in fact, Select Sands and Westbrook endeavored to gain this confidential, proprietary information from Propst to directly compete with Propst, and to prevent other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors. *See* Ex. 8 ¶ 5.

276.    Westbrook has wrongfully detained this property because it obtained it through material misrepresentations that it would assist Propst in obtaining leases from Hanson, Cemex, and other sand processors when, in truth and in fact, Westbrook endeavored to gain this confidential, proprietary information from Propst to assist Select Sands in its endeavors to directly compete with Propst, and to prevent other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors. *See* Ex. 8 ¶ 6.

277.    Propst's property that is in Select Sands' and Westbrook's possession has not been taken for a tax or fine against Propst, or under any order or judgment of a court against it, or seized under an execution or attachment against Propst's property. *See* Ex. 8 ¶ 7.

278.    Propst's cause of action against Select Sands and Westbrook has accrued within three (3) years. *See* Ex. 8 ¶ 8.

279.    In the alternative to paragraph 278, Propst's cause of action against Select Sands and Westbrook has not accrued within three (3) years, but, instead, has been concealed through Select Sands and Westbrook's affirmative acts of concealment, furtively planned, and secretly executed to keep Propst's cause of action concealed, or otherwise perpetrated in such a way that they concealed themselves. *See* Ex. 8 ¶ 9.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

280. Accordingly and for the reasons set forth in this Amended Complaint, the Court should issue an Order of Delivery directing the Sheriff of Pulaski County, Arkansas, to give Propst possession of all business records belonging to Propst, including but not limited to any Plant/Terminal Lease Agreements.

**COUNT X – PUNITIVE DAMAGES**

281. Propst incorporates paragraphs 1 through 280 by reference.

282. Select Sands and Westbrook knew or ought to have known, in the light of the surrounding circumstances, that entering into a conspiracy against Propst would naturally and probably result in damage to Propst.

283. Westbrook knew or ought to have known, in the light of the surrounding circumstances, that breaching its fiduciary duties to Propst would naturally and probably result in damage to Propst.

284. Vitols and Westbrook knew or ought to have known, in the light of the surrounding circumstances, that making false representations to Propst, concealing material information from Propst, and failing to disclose pertinent information to Propst would naturally and probably result in damage to Propst.

285. Mohammad and Select Sands knew or ought to have known, in the light of the surrounding circumstances, that tortuously interfering with the Propst Agreement would naturally and probably result in damage to Propst.

286. Mohammad, Select Sands, Vitols, and Westbrook knew or ought to have known, in the light of the surrounding circumstances, that tortuously interfering with Propst's business expectancies would naturally and probably result in damage to Propst.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

287.    Notwithstanding the foregoing, Mohammad, Select Sands, Vitols, and Westbrook intentionally pursued their courses of conduct for the purpose of causing Propst damage.

288.    Mohammad, Select Sands, Vitols, and Westbrook continued such conduct with malice and in reckless disregard of the consequences from which malice may be inferred.

289.    As a direct and proximate result of Mohammad's, Select Sands', Vitols's, and Westbrook's conduct, an award of punitive damages against each of them is proper.

WHEREFORE, Propst Properties, LLC prays for:

(a)    Judgment in Propst Properties, LLC's favor and against Rasool Mohammad, Select Sands America Corporation, Westbrook Willow, LLC, and Zigurds Vitols, jointly and severally;

(b)    Compensatory damages in excess of $75,000.00, exclusive of interest and costs;

(c)    Punitive damages in the greatest amount allowed by law;

(d)    A declaratory judgment that Propst Properties, LLC's Consulting Agreement with Westbrook Willow, LLC is null and void, and no longer in full force and effect;

(e)    An order of delivery directing the Sheriff of Pulaski County, Arkansas, to give possession of certain property to Propst Properties, LLC;

(f)    Propst Properties, LLC's attorneys' fees and costs;

(g)    Pre-judgment and post-judgment interest in the greatest amount allowed by law; and

(h)    All other relief to which Propst Properties, LLC is entitled.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**FILED UNDER SEAL**

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
E-Mail: mshannon@qgtlaw.com
E-Mail: jprice@qgtlaw.com
E-Mail: twyatt@qgtlaw.com

By:/s/ Michael N. Shannon
Michael N. Shannon, Ark. Bar No. 92168
Joseph W. Price, II, Ark. Bar No. 2007168
Thomas H. Wyatt, Ark. Bar No. 2013273

*Attorneys for Propst Properties, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2018, I electronically filed the foregoing with the Clerk of Court using the AOC eFlex electronic filing system, which shall send electronic notification to the following:

W.M. David Duke, Esq.
Dylan H. Potts, Esq.
GILL RAGON OWEN, P.A.
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas 72201

*Attorneys for Westbrook Willow, LLC*

/s/ Michael N. Shannon
Michael N. Shannon

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
FILED UNDER SEAL**

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2018-Jul-20 13:09:30
60CV-17-6345
C06D06 : 49 Pages

**CONSULTANT AGREEMENT**

THIS CONSULTANT AGREEMENT (the "**Agreement**") is effective this 7th day of AUGUST, 2014 (the "**Effective Date**"), by and between, Propst Properties, LLC, an Arkansas limited liability company ("**Company**"), its successors and assigns and affiliates, subsidiaries and related entities, whose address is P.O. BOX 85 BLACK ROCK AR 72415, and Westbrook Willow, LLC, an Arkansas limited liability company, its successors and assigns and affiliates, subsidiaries and related entities ("**Consultant**"), whose address is 349 Paradise Pt, Hot Springs AR 71913. Company and Consultant are sometimes referred to individually as a "**Party**" and sometimes collectively as the "**Parties.**"

WHEREAS, Company is engaged in the frac sand industry and hosts processors of frac sand and provides land for reserves of frac sand and/or processing of frac sand.

WHEREAS, Consultant provides consulting, advising, negotiation, and other services to frac proppant businesses.

WHEREAS, Company desires to engage Consultant and Consultant desires to be engaged in the provision of certain consulting, advising, negotiation, and other related services to the Company.

NOW THEREFORE, for and in consideration of the mutual terms and conditions set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, the Parties agree as follows:

1. Services. The Company hereby retains Consultant to advise, negotiate, and provide other services related to the frac proppant business in and around Lawrence County, Arkansas, as reasonably requested by Company (the "Consulting Services").

2. Compensation.

(a) In consideration for providing the Consulting Services, the Company agrees to pay Consultant, on a monthly basis, a sum equal to $150 per hour spent by Consultant in performing the Consulting Services; it being understood by the Parties that at all times during the Agreement, the monthly sum paid to Consultant shall be no less than two thousand dollars ($2,000).

(b) Upon the occurrence of the Company receiving monthly gross income in excess of twenty thousand dollars ($20,000), the Parties agree that Consultant shall be paid a ten percent (10%) commission on all gross revenues and income received by Company related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future. Upon the occurrence of the events listed in this Section, the payment of sums listed in Section 2(a) shall cease. Notwithstanding the foregoing, the Parties agree that if in any given month the commission amounts listed in this Section shall be less than $2,000, then the sums for Consulting Services listed in Section 2(a) shall be reinstituted such that Consultant shall at no time receive less than $2,000 a month from Company. The terms in this Section 2(b) shall survive the termination of this Agreement and shall continue to be binding on the Parties and their respective successors, assigns, and principals for at least ten (10) years from the onset of the particular revenue stream to Company related to its frac proppant business in Lawrence County, Arkansas, as it currently exists or may be modified in the future. For example, if Company enters into a contract whereby it receives revenue related to its frac proppant business in Lawrence County, Arkansas, in year 2 of this Agreement (2015), Consultant shall continue to receive its 10% commission on gross revenues received from such contract until the end of year 12 of this Agreement or until at least 2024 if the Agreement is terminated early, as provided herein.

EXHIBIT
1

3. Term. This Agreement shall begin as of the Effective Date hereof and shall continue for a period of twenty (20) years hereafter. Consultant may terminate this agreement without cause or penalty at any time upon the delivery of 30 days' prior written notice to the Company. At the conclusion of the twenty (20) year initial term, this agreement shall automatically renew for successive one-year terms unless terminated as provided herein. Notwithstanding the foregoing, all compensation due under Section 2(b) shall survive the termination of this Agreement and shall continue to be binding on the Parties and their respective successors, assigns, and principals for at least ten (10) years from the onset of the particular revenue stream to Company related to its frac proppant business in Lawrence County, Arkansas (as more particularly described in Section 2(b)).

4. Expenses. In addition to the payment of the compensation as identified herein, the Company agrees to reimburse Consultant for all reasonable and necessary expenses that Consultant may incur from time to time within ten (10) days of invoice. ~~Should Consultant anticipate incurring expenses in excess of $5,000 during any single calendar month, then~~ Consultant shall receive prior approval from the Company as a condition to reimbursement hereunder.

5. Cooperation and Disclosure of Financials and Contracts. Company agrees to use its commercially reasonable efforts to cooperate with and support Consultant in the performance of Consultant's duties as contemplated under this Agreement. Further, Company agrees to provide monthly income statements of the Company, any financial records of the Company, and copies of any contracts or agreements that outline revenue streams to the Company, to Consultant, upon request.

6. Independent Contractor Status. It is acknowledged, agreed and understood that Consultant shall serve as an independent contractor to the Company and not as an employee of the Company. Further, it is agreed and understood by the Parties that Consultant shall be entitled to render similar services for other companies and organizations.

7. Representations and Warranties.

The Parties each covenant and agree to the following:

(a) The Party is a corporation, duly organized, validly existing and in good standing under the laws of the State of Arkansas and is duly qualified and in good standing in each jurisdiction in which the failure to so qualify would materially and adversely affect its ability to perform its obligations under this Agreement.

(b) The Party has the full corporate power and authority to execute, deliver and perform this Agreement and such execution, delivery and performance has been duly authorized by all necessary corporate action on the part of the Party.

(c) Neither the execution nor delivery by the Party of this Agreement or of any of the other agreements contemplated to be executed by the Party pursuant to this Agreement will conflict with or result in a violation of the corporate documents of the Party or of any other written or oral agreement, arrangement or understanding to which the Party is a party or by which any of its assets, properties or rights are or may be affected.

(d) There are no actions, proceedings, claims or judgments pending, or to the Party's knowledge, threatened, against the Party that might have a material adverse effect on this Agreement, its financial condition or its ability to perform its obligations under this Agreement or any of the agreements contemplated to be executed by the Party pursuant to this Agreement.

8. Indemnification. The parties hereto agree to indemnify and hold harmless one another, and their respective officers, directors, equity holders, agents and employees from and against all liabilities and causes of action of every nature except for those liabilities and causes of action that might arise as the result of the gross negligence and/or willful misconduct of the other. If a claim by a third party is made against Consultant or the Company Parties (the "**Indemnified Party**"), and if the Indemnified Party intends to seek indemnity with respect to such claim, the Indemnified Party shall give written notice to the other Party of such claim promptly after the Indemnified Party becomes aware of such claim. Such notice shall set forth such information with respect to such claim as is then reasonably available to the Indemnified Party.

9. Miscellaneous. This agreement constitutes the entire understanding of the Parties hereto and may not be verbally modified. This agreement may only be modified and amended pursuant to a written document that is executed by the parties hereto. The laws of the state of Arkansas shall govern this Agreement and all litigation arising hereunder shall occur exclusively in Pulaski County, Arkansas. All provisions contained in this Agreement shall be binding on, inure to the benefit of, and be enforceable by Company and Consultant, and the permitted successors and assigns of Company and Consultant to the same extent as if each such successor and assign were named as a party to this Agreement. If any term, covenant, condition, or provision of this Agreement, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, it shall be adjusted rather than voided, if possible, to achieve the intent of the Parties. Any invalidity resulting from the length of a period of time shall be considered reduced to a period of time, which would cure such invalidity. If adjustment is not possible, then in each such event the remainder of this Agreement or the application of such term, covenant, condition or provision to any person or any other circumstance (other than those as to which has been held invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by applicable law.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date above written.

COMPANY:

Propst Properties, LLC

By: JAMES F. PROPST

Title: MEMBER

CONSULTANT:

Westbrook Willow LLC

By: __________

Title: PRESIDENT

 # NEWS RELEASE

**Select Sands Corp.**
**(formerly La Ronge Gold Corp.)**
Suite 701 – 675 West Hastings Street
Vancouver, BC V6B 1N2
Phone: 604 639-4533
Fax: 604 685-3765

**Select Sands Announces Start of Test Drilling on Arakansas, US, Frac Sand Property and Announces Zig Vitol Joining the Company's Board of Directors**

December 03, 2014 – **Vancouver, BC, Canada.** – Select Sands Corp. ("Select Sands" or the "Company") (TSXV: SNS) is pleased to announce the start of a drill program on the its Sandtown property in Northeast Arkansas, USA. The property is underlain by the Ordovician St. Peter sandstone formation, which is the source of 'Northern White' frac sand selling into the major US oil and gas play. There are several surface outcrop exposures of the St. Peter sandstone unit on the Property. The property is 3.1 miles from a highway, the power line is on the propriety, and the rail line about 14.7 miles away.

The phase one / reconnaissance drill program will test the depth / thickness of the sandstone and will determine the grade ie mesh sizes of the frac sand. The company will test the properties of frac sand as per the ISO 13503-2:2006/API RP 19C Recommended Practice for Measurement of Properties of Proppants Used in Hydraulic Fracturing and Gravel-packing Operations. These properties include sand sphericity and roundness, crush (K Value), acid solubility, turbidity and SiO2% content.

The company is also pleased to announce that Zigurds R. "Zig" Vitols has joined the company' board of directors.

Mr Vitols has been the President, Mid-South Division of Martin Marietta Material. Martin Marietta, an American-based company and a member of the S&P 500 Index, is a leading supplier of aggregates and heavy building materials, with operations spanning 32 states, Canada and the Caribbean. Dedicated teams at Martin Marietta supply the resources for the roads, sidewalks and foundations. Mr Vitols worked as Northeast Regional Manager for W. R. GRACE & Co,a publicly traded company producing specialty chemicals and materials operating in over 40 countries. Mr Vitol has an MBA, International Business from Heriot Watt University, Edinburgh, Scotland & Civil Engineering Technology, Mohawk College, Hamilton, Canada. Mr Vitols will be replacing Leonard Jaroszuk, who has resigned from the company's board. The company thanks Mr Jaroszuk for his work as a director of the company.

"Zig will help plan the company rail distribution network as per his previous experience with the Union Pacific, Burlington Northern Santa Fe, and Kansas City Southern Railroads." Commented the company's president Rasool Mohammad "beside logistics & distribution Zig's other areas of expertise such as Joint Ventures , Business Development, Operational Cost Optimization ,Competitive Market Positioning and International Responsibilities will help advance Company's frac sand project Arkansas, US."

The company is pleased to announce that it will be issuing up to 1 million options at 15c at to certain of its officers and directors.

Rasool Mohammad, B.Sc. (Mining), President & CEO

SELECT SAND CORP.
Phone: (604) 639-4533
Email: rasool@selectsandscorp.com

EXHIBIT 2

**SELECT SANDS** TSX.V: SNS | www.selectsandscorp.com

# NEWS RELEASE

**SELECT SANDS CORP.**
Suite 310 – 850 West Hastings Street
Vancouver, BC V6C 1E1
Phone: 604 639-4533

## Select Sands Appoints Zig Vitols as Chief Operations Officer

July 21, 2015 – Vancouver, BC, Canada. – **Select Sands Corp (TSXV: SNS, OTC: CLICF)** (the "Company") is pleased to announce the appointment of Zig Vitols as Chief Operations Officer of the company.

Mr. Vitols, a resident in Houston, Texas, has served as the President, Mid-South Division, of Martin Marietta Material, Inc. Martin Marietta, a U.S. based company included in the S&P 500 Index, is a leading supplier of aggregates and heavy building materials, with operations spanning 32 states, Canada and the Caribbean. Mr. Vitols worked as the Northeast Regional Manager for W. R. GRACE & Co, a publicly traded company which produces specialty chemicals and materials and operates in over 40 countries. Mr. Vitols has a Masters of International Business (MBA) from Heriot Watt University, Edinburgh, Scotland.

As C.O.O., Mr. Vitols will be responsible for planning the Company's rail and transportation distribution network, manage its logistics & distribution functions, optimize operational costs, provide a major role in business development including the negotiations of contracts, and generally assist the Company to obtain and increase market share and help advance the Company's frac sand project in Arkansas. Mr. Vitols will remain a member of the Select Sands' board of directors.

**About Select Sands Corp.**

**Select Sands** Sandtown property, located in Northeast Arkansas, USA, is underlain by the Ordovician St. Peter sandstone formation, *the* source of 'Ottawa White' Tier-1 frac sand/industrial silica sand selling into major US oil and gas basins as well as industrial and speciality end markets. The Sandtown property is

located 3.1 miles from Highway 167, near a natural gas pipeline, has an active power line on the property, and is about 14.7 miles away from the nearest rail system (See December 4, 2014 News Release). Sandtown has a competitive location advantage of 650 rail miles closer to Texas/Louisiana oil/gas plays and Houston port and industrial hub over Wisconsin sand mines.
As per Tetra Tech of Golden Colorado and Vancouver, BC, Canada recently completed report, 40% of the Sandtown property contains 22 million tons of Indicated resources of silica sand with a pre-tax NPV valued at US $160 million (See June 10,2015 News Release).

The Company also owns high-grade gold deposits in the La Ronge Gold Belt, northern Saskatchewan.

Cameron Bartsch, M.Sc., P.Geo., of Tetra Tech, a Qualified Person as defined by National Instrument 43-101, has reviewed the scientific and technical information disclosed in this News Release.

For more information about Select Sands Corp., please visit www.selectsandscorp.com or contact
Rasool Mohammad, B.Sc. (Mining), President & CEO.
Phone 604-639-4533

***Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accepts responsibility for the adequacy or accuracy of this Release.***

FORWARD-LOOKING INFORMATION

*This News Release includes forward-looking information and statements, which may include, but are not limited to, information and statements regarding or inferring the future business, operations, financial performance, prospects, and other plans, intentions, expectations, estimates, and beliefs of the Company. Information and statements which are not purely historical fact are forward-looking statements. Forward-looking information and statements involve and are subject to assumptions and known and unknown risks, uncertainties, and other factors which may cause actual events, results, performance, or achievements of the Company to be materially different from future events, results, performance, and achievements expressed or implied by forward-looking information and statements herein. Although the Company believes that any forward-looking information and statements herein are reasonable, in light of the use of assumptions and the significant risks and uncertainties inherent in such information and statements, there can be no assurance that any such forward-looking information and statements will prove to be accurate, and accordingly readers are advised to rely on their own evaluation of such risks and uncertainties and should not place undue reliance upon such forward-looking information and statements. Any forward-looking information and statements herein are made as of the date hereof, and except as required by applicable laws, the Company assumes no obligation and disclaims any intention to update or revise any forward-looking information and statements herein or to update the reasons that actual events or results could or do differ from those projected in any forward looking information and statements herein, whether as a result of new information, future events or results, or otherwise, except as required by applicable laws.*



Page | 1

EXHIBIT 4

CONFIDENTIAL

WESTBROOK - 000722



Page | 2

R M

CONFIDENTIAL

WESTBROOK - 000723





Page | 3

[redacted]

Rm

CONFIDENTIAL

WESTBROOK - 000724

Page | 4

CONFIDENTIAL

WESTBROOK - 000725

Page | 5

CONFIDENTIAL

WESTBROOK - 00[illegible]



Page | 6

Rn

CONFIDENTIAL

WESTBROOK - 000727

Page | 7



Rm

CONFIDENTIAL

WESTBROOK - 000728



Page | 8

CONFIDENTIAL

WESTBROOK-000729



Page |9

CONFIDENTIAL

WESTBROOK - 000730



Page | 10

CONFIDENTIAL

WESTBROOK-000731



Page | 11

CONFIDENTIAL

WESTBROOK-000782



Page | 12

CONFIDENTIAL

WESTBROOK 000733



Page | 13

CONFIDENTIAL

WESTBROOK - 000734

10/19/2017 Select Sands Agrees to Deal with Ozark Premium Sand

Search...

ROCK PRODUCTS

HOME NEWS KEY ISSUES FEATURES EQUIPMENT & TECHNOLOGY BLOG FRAC SAND BUYERS' GUIDE

Frac Sand

Frac Sand Newsletter Market Buzz Producer News Analysis New Products Frac Sar

Home Frac Sand Select Sands Agrees to Deal with Ozark Premium Sand

# Select Sands Agrees to Deal with Ozark Premium Sand

Published: Wednesday, 05 October 2016 15:20

?

Select Sands Corp. announced that it has entered into a binding agreement with Tuttle Holding, LLC and Steve Heckmann, Ozark Premium Sand LLC (OPS) pursuant to which Select Sands' wholly owned subsidiary, American Select Corp., will purchase certain OPS equipment and shall have the option to purchase OPS' dry processing plant, operating equipment, saleable inventory and customer lists amongst other miscellaneous assets owned by OPS.

Included in the assets, in respect to which the company will have an option to purchase, is a 26-acre fully operational drying facility with storage located within 50 miles of Select Sands' Sandtown quarry in Arkansas. The 26-acre facility is located on the Union Pacific Rail Line. If the option is exercised, this transaction will transform Select Sands into a fully integrated, self-sufficient Tier 1 sand producer with capacity to process more than 600,000 tpy with an excellent logistics and storage advantage, the company said. In addition, the facility can be easily expanded to increase the amount of sand that can be processed.

Rasool Mohammad, president and CEO of Select Sands, said, "We are very pleased to come to terms on this transaction that is very favorable for both parties moving forward. In the energy market, Tier-1 regional (40/70 and 100 mesh) sand is in high demand right now, and the market is tightening for this finer sand. Our timing to become a new supplier of high-purity, finer mesh sand couldn't come at a better time for our shareholders."

Pursuant to the terms of the agreement, Select Sands will pay $500,000 upon signing of the agreement to the vendors in respect of the purchase of certain heavy equipment. Select Sands will take title to these assets upon payment of the $500,000.

Select Sands will then have 60 days to complete its due diligence on the remaining assets that are subject to the agreement. If Select Sands is satisfied with its due diligence, then before the end of the due diligence period, it must pay an additional $250,000 to the vendors for certain specified additional heavy equipment and $250,000 as a payment for the option to acquire the remaining assets within the period expiring on the one-year anniversary of the date of payment of the above referenced $250,000 option payment. The purchase price for the remaining assets subject to the option will be $3,317,000, after deducting the $250,000 option payment.

As per the June 2015 PEA report by Tetra Tech of Golden, Colo., and Vancouver, B.C., Canada, the Sandtown property has a pre-tax net present value of $160 million and a post-tax net present value of $92 million.

"This transaction demonstrates our commitment to become a fully integrated producer in the most accretive way possible and demonstrates our aligned interests with shareholders," Mohammad said.

Tags: Select Sands | Tetra Tech |  Ozark Premium Sand |  frac sand | acquisition

## Related Articles

- **Polaris Poised to Meet Increased Demand ...**
- **What's the Deal? ...**
- **Twin Eagle Sand Logistics Acquires Terminal...**
- **U.S. Silica to Build Second Frac Sand Plant in the Permian...**
- **CRH to Acquire Ash Grove Cement...**
- **PERMITTING - SEPTEMBER 2017...**

EXHIBIT
5

FRAC SAND LATEST NEWS

**Athabasca Appoints Murray Chief Financial Officer**

Athabasca Minerals Inc. announced the appointm Lucas Murray, CPA, CA, to the position of chief fir officer.

- **Hi-Crush Announces Start of Operation Pecos Terminal**
- **Twin Eagle Sand Logistics Acquires Ter**
- **U.S. Silica to Build Second Frac Sand Pl Permian**
- **Microsoft, Halliburton Collaborate on C Project**

More in Frac Sand

RESOURCE CENTER

 10/12 Webinar: Drones in Mining Q&A

 Webinar: Using Drone Data for Mine Pl

 08/17 Webinar: Using Drone Data for Aggregates Inventory Management

 How to spot machine abuse

 How to reduce idle times and boost p

MOST POPULAR

# Select Sands Announces Zigurds "Zig" Vitols as President & CEO

EXHIBIT
tabbies
6

Select Sands Announces Zigurds "Zig" Vitols as President & CEO (http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

**VANCOUVER, BRITISH COLUMBIA – Dec. 23, 2016 –** Select Sands Corp. ("Select Sands" or the "Company") (TSX VENTURE:SNS)(OTCQX:SLSDF) today announced that Zigurds "Zig" Vitols, the Company's current Chief Operating Officer, has been appointed President and CEO of the Company. Mr. Vitols will be replacing Rasool Mohammad, who will be taking on a new role as Chief Operating Officer of Select Sands and President of American Select Corp., a wholly owned U.S. subsidiary of Select Sands. Mr. Mohammad will be moving to Houston, Texas during 2017 and Mr. Vitols will continue to be based in Houston.

> **"The Company is going through a very important transition period as we move towards production. I am very pleased to have Zig leading the Company during our next phase of growth," commented Rasool Mohammad. "Zig's skill set and experience will serve the Company well as we work to achieve full production status in 2017. More importantly, we continue to share a common vision of what the Company can achieve in the coming years."**
>
> **"The Company now enters the operational stage of its development and the Board of Directors has assembled a team that will continue to guide management in critical strategies and consequently management will take thoughtful and deliberate actions on its pathway to the next level," said the new CEO Zig Vitols. "Rasool Mohammad has been a key driver in the Company's development to this point and he will continue to focus on operational capabilities, M&A opportunities and assembling a first-rate operational team. The Company will maintain its initiative of growth in the industrial use markets while preparing operations to meet the resurgence of the Oil & Gas sector."**

**About Select Sands Corp.**

Select Sands Corp. is an industrial Silica Product company developing its 100% owned, 520-acre Northern White, Tier-1, silica sands project located in Arkansas, U.S.A. Select Sands' goal is to become a key supplier of premium Industrial silica sand and frac sand to the North American markets. Select Sands' Arkansas property has a significant logistical advantage of being approximately 650 rail-miles closer to oil and gas markets located in Oklahoma, Texas, New Mexico, and Louisiana.

For more information about Select Sands Corp., please visit www.selectsandscorp.com (http://www.selectsandscorp.com/).

**Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accepts responsibility for the adequacy or accuracy of this Release.**

FORWARD-LOOKING INFORMATION

*This news release includes forward-looking information and statements, which may include, but are not limited to, information and statements regarding or inferring the future business, operations, financial performance, prospects, and other plans, intentions, expectations, estimates, and beliefs of the Company. Such statements include the Company's ability to achieve full production status in 2017. Information and statements which are not purely historical fact are forward-looking statements. Forward-looking information and statements involve and are subject to assumptions and known and unknown risks, uncertainties, and other factors which may cause actual events, results, performance, or achievements of the Company to be materially different from future events, results, performance, and achievements expressed or implied by forward-looking information and statements herein. Although the Company believes that any forward-looking information and statements herein are reasonable, in light of the use of assumptions and the significant risks and uncertainties inherent in such information and statements, there can be no assurance that any such forward-looking information and statements will prove to be accurate, and accordingly readers are advised to rely on their own evaluation of such risks and uncertainties and should not place undue reliance upon such forward-*

*looking information and statements. Any forward-looking information and statements herein are made as of the date hereof, and except as required by applicable laws, the Company assumes no obligation and disclaims any intention to update or revise any forward-looking information and statements herein or to update the reasons that actual events or results could or do differ from those projected in any forward-looking information and statements herein, whether as a result of new information, future events or results, or otherwise, except as required by applicable laws.*

CONTACT INFORMATION
Select Sands Corp.
Rasool Mohammad, B.Sc. (Mining)
President & CEO
(604) 639-4533
www.selectsandscorp.com (http://www.selectsandscorp.com)Investor Relations
Arlen Hansen
(604) 684-6730
SNS@kincommunications.com

Facebook (http://www.facebook.com/sharer/sharer.php?u=http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/&t=Select+Sands+Announces+Zigurds+%22Zig%22+Vitols+as+President+%26+CEO)

Twitter Google+ (https://plus.google.com/share?url=http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

LinkedIn (http://www.linkedin.com/shareArticle?mini=true&ro=true&trk=EasySocialShareButtons&title=Select+Sands+Announces+Zigurds+%22Zig%22+Vitols+as+President+%26+CEO&url=http://www.selectsandscorp.com/sands-announces-zigurds-zig-vitols-president-ceo/)

E-mail (mailto:?subject=Visit this site http://www.selectsandscorp.com&body=Hi, this may be interesting you: "Select Sands Announces Zigurds "Zig" Vitols as President & CEO"! This is the link: http://www.selectsandscorp.com/2016/12/23/select-sands-announces-zigurds-zig-vitols-president-ceo/)

News – 2017 (http://www.selectsandscorp.com/news/2017-releases/)
News – 2016 (http://www.selectsandscorp.com/news/2016-releases/)
News – 2015 (http://www.selectsandscorp.com/news/2015-releases/)
News – 2014 (http://www.selectsandscorp.com/news/2014-releases/)
News – 2013 (http://www.selectsandscorp.com/news/2013-releases/)
News – 2012 (http://www.selectsandscorp.com/news/2012-releases/)
News – 2011 (http://www.selectsandscorp.com/news/2011-releases/)
News – 2010 (http://www.selectsandscorp.com/news/2010-releases/)
In the Media (http://www.selectsandscorp.com/news/media/)

## Latest News

Select Sands Reports Second Quarter 2017 Results (http://www.selectsandscorp.com/2017/08/15/select-sands-reports-second-quarter-2017-results/) August 15, 2017

Select Sands Corporation Schedules Second Quarter 2017 Results Conference Call (http://www.selectsandscorp.com/2017/08/11/sns-schedules-second-quarter-2017-results-coference-call/) August 11, 2017

Select Sands Provides Operations Update (http://www.selectsandscorp.com/2017/06/27/select-sands-provides-operations-update/) June 27, 2017

Contact us

Select Sands Corp.
Suite 310, 850 W Hastings
Vancouver, BC,
Canada V6C 1E1

Phone: +1 604-639-4533
Fax: +1-604-669-2744
Email: info@selectsandscorp.com

American Select Corp is a US subsidiary of Select Sands Corp

Disclaimer (/disclaimer/)

Search

Search

Subscribe

CLICK HERE TO JOIN

2016 - Select Sands Corp



CONFIDENTIAL

EXHIBIT
tabbles
7

WESTBROOK - 000866

- 2 -

CONFIDENTIAL

WESTBROOK - 000867

- 3 -



CONFIDENTIAL

WESTBROOK - 000868

- 4 -



- 5 -

CONFIDENTIAL WESTBROOK - 000870

- 6 -

CONFIDENTIAL

WESTBROOK - 000871



- 7 -

CONFIDENTIAL

WESTBROOK - 000872

- 8 -



CONFIDENTIAL

WESTBROOK - 000873

- 9 -

CONFIDENTIAL WESTBROOK - 000874

- 10 -



CONFIDENTIAL

WESTBROOK - 000875

- 11 -

CONFIDENTIAL

WESTBROOK - 000876

- 12 -



CONFIDENTIAL

WESTBROOK - 000877

- 13 -

CONFIDENTIAL

WESTBROOK - 000878

- 14 -

CONFIDENTIAL WESTBROOK - 000879

- 15 -

CONFIDENTIAL WESTBROOK - 000880

- 16 -

CONFIDENTIAL

WESTBROOK - 000881

- 17 -

CONFIDENTIAL

WESTBROOK - 000882

- 18 -

CONFIDENTIAL

WESTBROOK - 000883

- 19 -

CONFIDENTIAL

WESTBROOK - 000884



CONFIDENTIAL

CONFIDENTIAL

WESTBROOK - 000886



CONFIDENTIAL WESTBROOK - 000887



CONFIDENTIAL

WESTBROOK - 000888

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
SIXTH DIVISION

PROPST PROPERTIES, LLC PLAINTIFF

v. CASE NO. 60CV-17-6345

RASOOL MOHAMMAD; SELECT SANDS AMERICA CORPORATION; WESTBROOK WILLOW, LLC; and ZIGURDS VITOLS DEFENDANTS

**AFFIDAVIT OF JAMES F. PROPST**

I, James F. Propst, having first been duly sworn, state the following:

1. My name is James F. Propst. I am over the age of 18 and of sound mind. I have personal knowledge of the matters stated in this affidavit.

2. Select Sands America Corporation ("Select Sands") and Westbrook Willow, LLC ("Westbrook") are in possession of business records belonging to Propst Properties, LLC ("Propst"), including but not limited to any Plant/Terminal Lease Agreements.

3. The actual value of Propst's property that is in Select Sands' and Westbrook's possession cannot be quantified because it is confidential, proprietary, and contains trade secrets. To the extent that a value is required, Propst estimates that the value of the confidential, proprietary, and trade-secret information is greater than $1,000,000.00.

4. Propst is the owner of the property and has a special ownership interest in the property because it is confidential, proprietary, and contains trade secrets.

5. Select Sands and Westbrook have wrongfully detained this property because they obtained it through material misrepresentations about Select Sands' interest in leasing property from Propst when, in truth and in fact, Select Sands and Westbrook endeavored to gain this confidential, proprietary information from Propst to directly compete with Propst, and to prevent

EXHIBIT
8
tabbies

other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

6.      Westbrook has wrongfully detained this property because it obtained it through material misrepresentations that it would assist Propst in obtaining leases from Lehigh Hanson, Cemex, and other sand processors when, in truth and in fact, Westbrook endeavored to gain this confidential, proprietary information from Propst to assist Select Sands in its endeavors to directly compete with Propst, and to prevent other sand processors from leasing property owned by Propst until Select Sands could acquire competing properties of its own that it would lease to sand processors.

7.      Propst's property that is in Select Sands' and Westbrook's possession has not been taken for a tax or fine against Propst, or under any order or judgment of a court against it, or seized under an execution or attachment against Propst's property.

8.      Propst's cause of action for replevin against Select Sands and Westbrook has accrued within the last three (3) years.

9.      Propst's cause of action for replevin against Select Sands and Westbrook has been concealed through Select Sands' and Westbrook's affirmative acts of concealment, furtively planned, and secretly executed to keep Propst's cause of action concealed, or otherwise perpetrated in such a way that they concealed themselves.

FURTHER THE AFFIANT SAYETH NOT.

James F. Propst

20 JULY 2018
Date

STATE OF ARKANSAS )
)
COUNTY OF PULASKI )

Acknowledged before me this 20th day of July, 2018.

Notary Public

07/20/2018
Date

[SEAL]

SUSAN E. NULL
NOTARY
My Comm. Expires
MARCH 7, 2021
#12381082
PUBLIC
LONOKE COUNTY, ARK.